976 F.2d 1026
 Stephen C. McMATH, Plaintiff-Appellee,
v.
CITY OF GARY, INDIANA, Thomas V. Barnes, individually and in
his capacity as Mayor of the City of Gary, Beulah Ware,
individually and in her capacity as Director of Personnel
for the City of Gary, et al., Defendants-Appellants.
 Nos. 90-2352, 91-2126, 91-2127 and 91-2128.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 10, 1992.
Decided Sept. 28, 1992.
As Amended Sept. 29, 1992.
Rehearing Denied Nov. 3, 1992.
 
 Ivan E. Bodensteiner (argued), Valparaiso, Ind., for plaintiff-appellee.
 Cora M. Vaughn (argued), Vaughn & Associates, Gilbert King, Jr., Corp. Counsel, Office of Corp. Counsel, Gary, Ind., for defendants-appellants.
 Before BAUER, Chief Judge, and FLAUM and RIPPLE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 After his dismissal as Director of the General Services Administration for the City of Gary, Indiana, Stephen McMath sued the city and four of its officials under 42 U.S.C. § 1983, claiming that the firing violated his occupational liberty interest, and thereby contravened his substantive and procedural due process rights. He also brought a supplemental state count alleging wrongful discharge. The defendants filed a motion to dismiss McMath's amended complaint, and also raised the defense of qualified immunity. The magistrate judge dismissed McMath's substantive due process count, denied the defendants' motion as to the remaining counts, and rejected the defense of qualified immunity. The judge then certified the immunity defense as frivolous and refused to stay the trial pending appeal of the issue. The matter went to trial, and all but one of the defendants (who, obviously, is not a party to this appeal), were found liable on both the federal and state counts. The magistrate judge awarded attorney's fees and costs to McMath under 42 U.S.C. § 1988.
 
 
 2
 The defendants raise numerous issues on appeal. First, they pursue their motion to dismiss, claiming that the magistrate judge erred in refusing to grant them qualified immunity, and that McMath's complaint failed to adequately plead the violation of a liberty interest. Next, they contend that the evidence was insufficient to support findings of liability on either the § 1983 or state wrongful discharge counts. Finally, the defendants dispute the award of attorney's fees to the plaintiff.
 
 I.
 
 3
 Stephen McMath was hired as Director of General Services ("GS") by former Gary Mayor Richard Hatcher in May 1986, and in December 1987 was reappointed by Hatcher's successor, defendant Thomas Barnes. In early 1988, McMath convened a meeting with Barnes to discuss rumors that a GS employee, Donald McDuffie, was engaging in loan sharking activities on GS property. The mayor summoned Gary Police Chief Cobie Howard, also a defendant, to the meeting, and directed McMath and Howard to address the matter. The two conferred, and a few days later Howard called McMath, telling him that he would set up police surveillance at GS in an attempt to catch McDuffie in the act. According to McMath, Howard expressed concern that whomever he selected to conduct the investigation might inform McDuffie.
 
 
 4
 In light of that concern, McMath claims, a couple weeks later he contacted Howard and agreed to talk with McDuffie himself. During McMath's conversation with McDuffie, McDuffie agreed to--and subsequently did--retire. McMath assumed that this confrontation and McDuffie's retirement had solved the problem, and therefore did not order McDuffie to stay off GS property, and naturally did not tell Howard that he told McDuffie to do so.
 
 
 5
 McMath testified that he heard nothing further about McDuffie's alleged loan sharking activities until an October 4, 1988, cabinet meeting, during which Beulah Ware, the city's personnel director and a defendant in this case, raised the issue. Howard, also in attendance, agreed to take care of the matter. Three days later, McMath received a telephone call from Howard, asking when paychecks were distributed to GS employees and indicating that he thought that would be an opportune time to send a few officers over to GS to investigate McDuffie's alleged activities. One of those officers testified that Howard ordered them to arrest McDuffie for trespassing, which they did. According to McMath, Howard was upset because the officers had arrested McDuffie before they saw him actually engaging in loan sharking activities.
 
 
 6
 After the arrest, an officer contacted McMath and demanded that he sign an affidavit alleging that he had ordered McDuffie's arrest, that McDuffie was loan sharking on GS property, and that McMath had warned McDuffie to stay off the GS property. According to McMath, he was led to believe that the affidavit was already prepared, and that he need only provide his signature. McMath responded that he could not sign the false affidavit, but agreed to see if anyone at GS would come forward with information regarding McDuffie's activities. Later that day, McMath received a telephone call from Howard asking him to sign the affidavit. According to McMath, he was again led to believe the affidavit was already prepared, and he told Howard he could not sign a false affidavit because he did not want to commit perjury.
 
 
 7
 The next day, McMath received a telephone call from another officer, again asking him to sign an affidavit and again leading him to believe it was already prepared. McMath reiterated that he would not sign it and explained his reasons. He received yet another telephone call on October 11 from a Detective Burns, informing him that his signature was needed on an affidavit. Later that day, Howard renewed his request, McMath again refused, and Howard said that he would send a report of the incident to Mayor Barnes, indicating McMath's refusal to cooperate in the investigation.
 
 
 8
 Shortly thereafter, on October 14, McMath was called to a meeting at Barnes' office--attended by Barnes, Ware, Howard, and Booker Blumenberg, director of public safety--and learned that Howard had indeed forwarded a written report to Barnes. McMath, however, was not given a copy of the report. At the meeting, Howard told Barnes that McMath refused to sign the affidavit. McMath presented his version of the events, including the fact that he had originally raised the McDuffie issue with Barnes in 1988; that Howard had agreed to take care of it but could not find an officer he could trust to set up surveillance; that he talked with McDuffie, who agreed to resign; and that he felt he was being asked to cover for poor police work and had been requested to sign a false affidavit. Barnes said he would investigate the matter further, and McMath left the meeting.
 
 
 9
 McMath then received a memorandum dated October 17, signed by Blumenberg and prepared at Barnes' direction, notifying him that he was suspended for two weeks without pay. On October 26, Ware informed McMath by written notice that he was terminated, effective October 28. Soon after his dismissal, by way of a letter dated November 2, 1988, McMath's attorney requested a "name clearing" hearing.
 
 
 10
 Around this time, several people in the community contacted McMath, telling him they heard he was fired for failure to cooperate at GS and for running a loan sharking ring there. According to McMath, although he initiated discussions of his discharge with some community members, he indicated the firing was a result of his failure to sign a false affidavit rather than for failure to cooperate with the police department's investigation of McDuffie.
 
 
 11
 The case was tried before a jury in October 1990. The jury awarded McMath $50,000 in compensatory damages--$17,500 on the § 1983 claim and $32,500 on the wrongful discharge claim. In responding to special interrogatories, the jury found that the defendants' actions stigmatized McMath based upon public statements made at the time of his discharge, that they neglected to provide the due process hearing to which he was entitled, and that they discharged him for refusing to sign a false affidavit. Because McMath prevailed on his federal claim, the magistrate judge awarded him attorney's fees and costs under 42 U.S.C. § 1988.
 
 II.
 
 12
 The defendants' first claim on appeal is that the magistrate judge erred in refusing to dismiss the § 1983 count on qualified immunity grounds or on the ground that McMath did not adequately allege the violation of a protectible liberty interest. Although we do not necessarily agree with the magistrate judge's determination that the immunity claim was frivolous, we do believe that the factual allegations contained within the complaint are sufficient to defeat the immunity defense and survive the motion to dismiss.
 
 
 13
 In his amended complaint, McMath alleged, among other things, that the defendants' conduct violated his occupational liberty interest because (1) his discharge was accompanied by false and stigmatizing public charges, and (2) he was not given the opportunity for a "name clearing" hearing. The defendants raised a qualified immunity defense--except for the City of Gary, which could not, see Hedge v. County of Tippecanoe, 890 F.2d 4, 8 (7th Cir.1989)--and moved to dismiss the complaint. The magistrate judge denied the motion. The defendants then filed a notice of appeal, seeking interlocutory review of the judge's order. The magistrate judge certified the claim as frivolous, see Apostol v. Gallion, 870 F.2d 1335, 1338 (7th Cir.1989), and declined to stay the trial pending the appeal. McMath v. City of Gary, No. H 89-0179, slip op. at 5 (N.D.Ind. June 6, 1990). Thereafter, we entered an order denying the defendants' motion for stay of the trial.
 
 
 14
 In Apostol, we admonished district courts to act with restraint in using their power to certify the frivolity of an appeal, 870 F.2d at 1339, and we reiterate that admonition here. Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), authorized pre-trial appeals for defendants claiming qualified immunity; that right would be eviscerated if district courts, cloaked with the authority of Apostol, could too easily certify even potentially meritorious appeals as frivolous. The stamp of frivolity should only be used when a Forsyth appeal is "unfounded." Apostol, 870 F.2d at 1339. Given the rather spartan factual pleadings in the plaintiff's amended complaint, we do not with confidence pronounce that the defendants' interlocutory appeal was frivolous. It is for the district court, and not us, to determine in the first instance whether an appeal is frivolous. In light of our July 5 order, however, we reject the defendants' argument that the filing of the notice of appeal divested the district court of jurisdiction over the qualified immunity issue. A baseless notice of appeal does not divest the district court of its jurisdiction. See id.
 
 
 15
 That digression aside, we find that the immunity defense, even if not frivolous, is without merit. Although raising qualified immunity in a motion to dismiss--rather than in the more typical vehicle, a summary judgment motion, which has the benefit of additional factual development--is permissible, it means that the only facts before us in ruling on the motion are those alleged in the complaint, which we must take as true--although, of course, this does not mean they necessarily are true. McDonald v. Haskins, 966 F.2d 292, 292 (7th Cir.1992); K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 847 (7th Cir.1990); Patton v. Przybylski, 822 F.2d 697, 698 (7th Cir.1987). In addition, we view all allegations in the light most favorable to the plaintiff. Caldwell v. City of Elwood, Ind., 959 F.2d 670, 671-72 (7th Cir.1992). Dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Strauss v. City of Chicago, 760 F.2d 765, 767 (7th Cir.1985) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); see Caldwell, 959 F.2d at 671-72. While the lack of intimation of any facts underlying the claim will justify dismissal, id., we must construe pleadings liberally, and mere vagueness or lack of detail is an inadequate basis for granting a motion to dismiss. Id.
 
 
 16
 Here, although McMath pled relatively little in the way of facts, he did provide a sufficient factual basis upon which to conclude that the alleged violation, if true, violated a clearly established right. See Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). McMath's complaint alleged that the defendants, in discharging McMath,
 
 
 17
 referred to his "actual or constructive knowledge of possible unlawful misconduct occurring on or about the General Services' property and [his] failure to take any action to stop these activities." Such allegations impugn the plaintiff's moral character and honesty in that they suggest involvement in criminal activity, or at least participation in an effort to cover such activity. Defendants and agents of the defendants communicated these false allegations to members of the public thereby adversely affecting the plaintiff's good name and reputation and foreclosing employment opportunities in his profession....
 
 
 18
 Amended Complaint p 14. The admittedly "boilerplate-plus" language provided adequate facts upon which to base the alleged violation of a liberty interest and survive the defendants' motion to dismiss. See K.H. ex rel. Murphy, 914 F.2d at 850. At the time of McMath's discharge on October 28, 1988, it was clearly established that when the government terminates a public employee and makes false or substantially inaccurate public charges or statements that stigmatize the employee, that employee's liberty interest is implicated. Codd v. Velger, 429 U.S. 624, 630, 97 S.Ct. 882, 885, 51 L.Ed.2d 92 (1977); Bishop v. Wood, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); Lawson v. Sheriff of Tippecanoe County, Ind., 725 F.2d 1136, 1138 (7th Cir.1984) (deprivation of occupational liberty exists when an employee is fired for publicly announced reasons that impugn moral character). We have recently observed that to state such a claim, a plaintiff must show that "(1) he was stigmatized by the defendant's conduct; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." Johnson v. Martin, 943 F.2d 15, 16 (7th Cir.1991); see also Ratliff v. City of Milwaukee, 795 F.2d 612 (7th Cir.1986); Munson v. Friske, 754 F.2d 683, 693 (7th Cir.1985). Since the complaint alleges the defendants discharged McMath in conjunction with publicly communicated, false statements that McMath either participated in or condoned criminal activity, it properly sets out a violation of McMath's clearly established right to a name clearing hearing. See Codd, 429 U.S. at 628, 97 S.Ct. at 884.
 
 
 19
 The defendants, citing Siegert v. Gilley, --- U.S. ----, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), also contend that the complaint must fail because the allegations do not allege concurrent termination and publication, or actual malice by the defendants. Siegert, however, emphasized that the publication must occur in the context of termination. There, the defamatory statement only affected the plaintiff's opportunities for future government employment; it was not made incident to the plaintiff's loss of current employment. Siegert, at ----, 111 S.Ct. at 1794. Here, in contrast, there is a nexus between the firing--the loss of current employment--and the publication sufficient to implicate a liberty interest cognizable under Siegert and prior case law. See Koch v. Stanard, 962 F.2d 605, 607-08 (7th Cir.1992) (Flaum, J., concurring) (noting that Siegert does not alter traditional rule that liberty interest is implicated when a government official's publication of a defamatory statement stigmatizes public employee in a manner that substantially forecloses opportunities for future government employment and is made incident to an adverse current employment decision) (citing Siegert, --- U.S. at ----, 111 S.Ct. at 1794); see also Wroblewski v. City of Washburn, 965 F.2d 452, 456 n. 3 (7th Cir.1992) (citing same).
 
 
 20
 As to the defendants' contention regarding actual malice, Siegert, while referencing the malice issue, did so in the context of a pure defamation claim, --- U.S. at ----, 111 S.Ct. at 1794, and indeed, rejected the view that infringement of a terminated employee's liberty interest turns on the defendant's state of mind. Id. Accordingly, the motion to dismiss the amended complaint on qualified immunity grounds, as well as upon a failure to adequately allege the violation of a liberty interest, fails.
 
 III.
 
 21
 We next address whether McMath presented sufficient evidence to support the jury's verdict that the defendants violated his occupational liberty interest. We review de novo the magistrate's denial of a motion for judgment notwithstanding the verdict, Aungst v. Westinghouse Elec. Corp., 937 F.2d 1216, 1219 (7th Cir.1991), and determine for ourselves whether the evidence is sufficient to support the verdict. Collins v. State of Illinois, 830 F.2d 692, 697 (7th Cir.1987). In so doing, we accord great deference to the jury's decision, Winston Network v. Indiana Harbor Belt R.R. Co., 944 F.2d 1351, 1358 (7th Cir.1991); A. Kush & Assocs., Ltd. v. American States Ins. Co., 927 F.2d 929, 934 (7th Cir.1991), particularly if affected by issues of credibility. Brown v. M & M/Mars, 883 F.2d 505, 507 (7th Cir.1989). "[I]t is well-settled that a jury verdict will not be set aside if a reasonable basis exists in the record to support that verdict." A. Kush & Assocs., 927 F.2d at 934; Spesco v. General Elec. Co., 719 F.2d 233, 237 (7th Cir.1983).
 
 
 22
 At bottom, the defendants argue that McMath failed to establish any link between these defendants and the publication of stigmatizing comments regarding McMath's dismissal. Of course, only if the defendants themselves published the defamatory material can McMath recover for deprivation of his liberty interest. Koch, 962 F.2d at 607 (citing Bishop, 426 U.S. at 348-49, 96 S.Ct. at 2079-80). "When a public employer fires an employee to the accompaniment of public charges of serious wrongdoing, and the charges are false, the employer may be liable for having deprived the employee of liberty without due process of law." Clark v. Maurer, 824 F.2d 565, 566 (7th Cir.1987); see Codd, 429 U.S. at 630, 97 S.Ct. at 885; see also Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir.1987); Lawson, 725 F.2d at 1138. Absent proof that the defendants disseminated the stigmatizing information beyond the appropriate chain of command within the City of Gary, McMath cannot succeed. See Martin, 943 F.2d at 17; see also Wroblewski, 965 F.2d at 456 n. 2 ("To be constitutionally cognizable, however, an official's defamation must consist of specific stigmatizing statements that are made public".) (emphasis added); Ratliff, 795 F.2d at 625-627. After a thorough review of the record, we find insufficient evidence to support a finding linking these defendants with any specific stigmatizing public statements.
 
 
 23
 Testimony at trial indicated that Howard had recommended that McMath be replaced and agreed with the discharge, that Ware recommended that McMath be fired, and that Blumenberg had acquiesced in that decision. The defendants contend, however, that McMath was discharged because he knew or should have known that McDuffie was engaging in illegal loan sharking activities on city property under McMath's control, and that McMath took no action to put a stop to these activities despite being ordered to do so by Mayor Barnes. According to the defendants, McMath refused to cooperate not because he refused to falsify an affidavit, but because he did not want to put McDuffie, a long-time acquaintance, in jail, and because he feared repercussions from McDuffie if he attempted to do so. McMath, as discussed, maintains that he was fired for his refusal to falsify the affidavit and thereby cover up the shoddy work by the officers who inappropriately arrested McDuffie for trespassing.
 
 
 24
 At trial, the evidence demonstrated that after the October 14 meeting, McMath received a letter, signed by Ware, terminating his employment. The letter stated that the action was "based upon [his] failure to satisfactorily perform [his] supervisory responsibilities including [his] actual or constructive knowledge of possible unlawful misconduct occurring on or about General Services' properties and [his] failure to take any action to stop these activities." McMath testified that neither Ware nor Barnes ever said anything to give him the impression that he was being discharged for a false affidavit, Tr. 77, 78, that he was not aware that any of the defendants made public statements regarding the reasons for his discharge, Tr. 78, and that, as far as he knew, the defendants had never discussed the circumstances of his discharge with any prospective employers. McMath stated that Howard, the only person at the October 14 meeting to mention the affidavit, said McMath would not cooperate with the police department and refused to sign the affidavit against McDuffie. Tr. 129.
 
 
 25
 McMath further testified that numerous people in the community--ranging from neighbors to council members--approached him about the firing. Tr. 66-67. According to McMath, these people told him they heard he was fired from GS for refusing to cooperate with the investigation of McDuffie and for running a loan sharking ring. He further testified that although he had discussed his dismissal with a number of people, he made clear that he was fired solely for refusing to sign a false affidavit. According to McMath, precinct committeeman Nathaniel Coleman was told that officials were "insinuating that criminal activity is involved." Tr. 71.
 
 
 26
 Coleman later testified that he called the police department to find out the reason for McMath's discharge, and spoke with a secretary who stated the department was conducting an investigation and that she was not at liberty to discuss the matter. According to Coleman, the secretary said nothing to suggest that McMath was implicated in the investigation. Tr. 216. He also stated that he spoke with Sadie Springfield, a GS employee, who told him "that they were going to fire him. They were going to fire him about McDuffy [sic] as a loan shark." Tr. 218. Coleman testified that Springfield indicated that McMath was being fired for refusing to cooperate with the investigation. Tr. 219. Robert Comer, a former GS employee who had worked with McMath, testified that Henry Adams, McMath's replacement, told him that McMath was discharged because he "was not cooperating" with the police investigation and "had condoned some things that Mr. McDuffie had been doing" in GS. Tr. 145. Frank Perry, another GS employee, testified that after McMath's discharge he heard rumors from employees at GS that McMath "was involved in connection with some kind of loan shark." Tr. 186. Perry also testified that Adams indirectly connected McMath to McDuffie "because he [Adams] said he [McMath] should keep [McDuffie] away," and that Adams suggested that McMath's failure to do so was part of the reason for the firing. Tr. 188.
 
 
 27
 Police Chief Howard testified that he had discussed McMath's discharge with a number of people, including the deputy mayor, cabinet members, the mayor's administrative assistant, his deputy chief, and possibly Clement Allen, a city council member, but denied ever linking the discharge to the refusal to sign the affidavit. He further testified that he told David Wade, his deputy chief, that McMath was not cooperating in the McDuffie probe, and had refused to supply a list of employee names for investigating McDuffie's dealings with GS employees. Tr. 169.
 
 
 28
 Ware testified that the only discussions she had with GS personnel regarding McMath's discharge would have been to figure out the time he worked for salary purposes. She stated that the papers relating to his discharge would be included in his personnel file, and that persons working in the personnel office would have access to those files. Tr. 178. She also testified that she recommended McMath's discharge because she felt that he had prior knowledge of McDuffie's loan sharking activities on GS property. Tr. 180.
 
 
 29
 We have scoured the record for additional statements implicating Ware, Howard, or Barnes, but to no avail. And while the above testimony might well lead to an inference that someone within the city government revealed false and damaging information regarding McMath's dismissal, we find insufficient evidence to link these particular defendants to any public statements. The general premise behind McMath's argument seems to be as follows. Only McMath and the defendants knew about the McDuffie incident as it related to McMath's dismissal; since McMath did not disseminate the information, the defendants must have done so. But this res ipsa loquiturlike approach, while perhaps sufficient to establish that someone within city government published the information, does not sufficiently establish that the someone was Ware, Howard, or Barnes.
 
 
 30
 In declining to grant the defendants' motion for a directed verdict at the close of the plaintiff's case, the magistrate judge expressed reservations about the sufficiency of the evidence introduced to show that the defendants disseminated the reason for the discharge, but gave the plaintiffs the benefit of the doubt at that stage of the proceeding. Tr. 239. The court subsequently denied the defendants' motion for judgment notwithstanding the verdict, stating that "[t]he jury was asked to perform its normal function: resolve the factual disputes. Based upon the jury's answers to the special interrogatories and the verdict, it is clear that the jury accepted McMath's version of the events." Order, No. H 89-179, at 6 (May 9, 1991). In Special Interrogatory No. 1, the jury found that all defendants except Blumenberg "made public statements following the termination of plaintiff Stephen McMath that were false, would adversely effect his moral reputation, or would stigmatize him in a way that he would be foreclosed from other employment opportunities." This interrogatory, however, does not provide an adequate basis upon which to uphold the jury's verdict. The fact that the jury found Blumenberg not liable is not enough to support the jury's specific findings of liability as to Ware, Howard, and Barnes.
 
 
 31
 In his memorandum opposing the defendants' motion for judgment notwithstanding the verdict or new trial, McMath stated that "[e]vidence that false statements were disseminated was substantial." Memorandum at 3 (emphasis added). But, again, that assertion neglects a critical prerequisite to liability: McMath must show that the defendants disseminated those statements. Although we take the evidence and all reasonable inferences from it in the light most favorable to McMath, the evidence supporting the verdict must be more than a "mere scintilla." Bruno v. City of Crown Point, Ind., 950 F.2d 355, 361 (7th Cir.1991). Here, McMath failed to in any way connect the named defendants with the stigmatizing statements. The only evidence McMath cited to support his assertion that false statements were disseminated was the jury's finding that McMath was fired because of his refusal to falsify the affidavit, the existence of internal correspondence pertaining to the matter, general statements by agents of the city, and the fact that according to McMath's testimony various community members heard rumors pertaining to his refusal to cooperate in the McDuffie investigation. None of this, however, provides a specific tangible link between the named defendants and publication.
 
 
 32
 It may well be, as McMath asserts and the magistrate judge found, that the jury accepted McMath's version of the events. But this does not provide adequate evidence to connect the defendants to publication. Although we are extremely reluctant to reverse jury verdicts, especially in cases, such as this, which rely heavily on credibility determinations, on the facts before us, we are compelled to do so because of the lack of any adequate evidence linking these defendants to the publication. The jury's verdict can only be upheld if there is "a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts." Allen & O'Hara, Inc. v. Barrett Wrecking, Inc., 898 F.2d 512, 515 (7th Cir.1990) (emphasis added) (quoting Selle v. Gibb, 741 F.2d 896, 900 (7th Cir.1984)). Here, we find that only through speculation could the jury have rendered its verdict.
 
 
 33
 To take one example, the sole evidence linking Ware with publication was her testimony that she placed the termination information in McMath's personnel file. But the publication requirement is not satisfied with the mere existence of a "likelihood of public disclosure." See Johnson, 943 F.2d at 16. To establish publication, McMath had to prove that Ware disseminated the stigmatizing information beyond the proper chain of command within her department. Information kept within the department--and, specifically, within McMath's personnel file--may indeed be a "ticking time bomb," Maurer, 824 F.2d at 566, but until the time bomb explodes--i.e., until the information is disseminated--there is no publication and no constitutional tort. Id. (citing Bishop, 426 U.S. at 348-49, 96 S.Ct. at 2079-80)); see Johnson, 943 F.2d at 17 (potentially stigmatizing information which remains in a discharged employee's personnel file has not been made public). Similarly, testimony indicated that Howard told his deputy chief that McMath failed to cooperate, and McMath testified that his replacement, Adams, also received information to that effect. But stigmatizing information that has not been disseminated beyond the proper chain of command has not been made public. Johnson, 943 F.2d at 17; see Ratliff, 795 F.2d at 627. Absent proof that the defendants disseminated the stigmatizing information in a manner which would reach future potential employers of the plaintiff, or the community at large, McMath cannot succeed.
 
 
 34
 Although McMath emphasizes that as the prevailing party is entitled to every permissible inference from the evidence, see Tice v. Lampert Yards, Inc., 761 F.2d 1210, 1213 (7th Cir.1985), on the record before us, even if all inferences are drawn in McMath's favor, insufficient evidence exists to support a determination that the defendants published the statements. Furthermore, the City of Gary cannot be held liable on this claim unless Mayor Barnes, an official whose acts constituted official policy of the City of Gary, violated McMath's liberty interests. See Webb v. City of Chester, Ill., 813 F.2d 824, 829 (7th Cir.1987) (although doctrine of respondeat superior does not apply to § 1983 claims, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.") (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)); Reed v. Village of Shorewood, 704 F.2d 943, 953 (7th Cir.1983). Since the record provides no evidence linking Barnes with any public statements implicating McMath's liberty interests, the City of Gary likewise cannot be held liable on the liberty interest claim.
 
 
 35
 In light of the deficient evidence to support a finding of publication by the defendants, we are compelled to reverse the jury verdict on McMath's federal liberty interest claim, and find in favor of defendants Ware, Howard, and Barnes.
 
 IV.
 
 36
 The defendants next contend that the evidence was insufficient to support a finding of liability on the state wrongful discharge claim. They further allege that they were entitled to qualified immunity on this claim pursuant to the Indiana Tort Claims Act, which governs actions against municipalities and their employees, because they were not performing a nondiscretionary function or acting beyond the scope of their employment in terminating McMath. See Ind.Code. § 34-4-16.5-3.
 
 
 37
 As to qualified immunity, the defendants raised such a general defense in their motion to dismiss, but did not seek immunity under the Indiana statute. Given this, the magistrate judge merely held that the qualified immunity defense available in § 1983 actions is inapplicable to state counts. We agree with McMath that the defendants have waived this claim by failing to properly raise it below. See Reliance Ins. Co. v. Zeigler, 938 F.2d 781, 784 n. 3 (7th Cir.1991); Barnett v. Stern, 909 F.2d 973, 978 (7th Cir.1990).
 
 
 38
 Turning to the merits, we find there was sufficient evidence to support the jury's determination. McMath's wrongful discharge claim was based upon his contention that the defendants discharged him because he refused to falsify the affidavit. Under Indiana law, although employees at will can be discharged for any reason as a general matter, under the "illegal act" exception, an employee at will can recover for wrongful discharge if he was terminated "for refusing to commit an illegal act for which he would have been personally liable." McClanahan v. Remington Freight Lines, Inc., 517 N.E.2d 390, 393 (Ind.1988). Under Indiana law, an affidavit is "a written statement under oath taken before an authorized officer," Yang v. Stafford, 515 N.E.2d 1157, 1160 (Ind.Ct.App.1987), and further, Indiana Code § 35-44-2-1 provides that a person who "makes a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true" commits perjury, a Class D felony. Therefore, under the "illegal act" doctrine, the defendants were proscribed from terminating McMath for refusing to sign a false affidavit.
 
 
 39
 McMath presented sufficient evidence for the jury to conclude that he was in fact discharged for the reasons he alleged. For example, he testified that he was led to believe that the affidavit was already prepared, that he was to come to the police station to sign it, and that it contained false statements about his being the complainant and having ordered McDuffie to stay off GS property. He also testified that he would not sign the affidavit because of the false information. The jury could have inferred that Howard's statements that McMath had failed to cooperate, and that Ware's October 26 termination letter to that effect--i.e., noting that his discharge was based on his failure to perform his supervisory responsibilities, including his "actual or constructive knowledge of possible unlawful misconduct ... and his failure to take any action to stop these activities"--which was authorized by Barnes, in fact referenced his refusal to falsify the affidavit. The jury could well have accepted McMath's version of the facts. Sufficient evidence exists in the record to support the jury's verdict on the common-law wrongful discharge claim.
 
 V.
 
 40
 Finally, the defendants challenge the award of attorney's fees and costs to McMath under 42 U.S.C. § 1988 ("in any action or proceeding to enforce a provision of [42 U.S.C. § 1983] ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs"). Given our disposition of the § 1983 count, the fee award must be reversed.
 
 
 41
 AFFIRMED IN PART AND REVERSED IN PART.