Stephen EBERHARDT,
Plaintiff–Appellant,

v.

Jack O'MALLEY, et al., Defendants–
Appellees.

No. 93–2440.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1994.

Decided March 1, 1994.

Thomas A. Appel (argued), Lansing, IL, for plaintiff-appellant.

Randolph M. Johnston, Karen J. Diamond, Office of the State's Atty. of Cook County, Chicago, IL, Terry L. McDonald, Asst. State's Atty., Office of the State's Atty. of Cook County, Federal Litigation Div., Chicago, IL, Karen A. Covy (argued), Office of the State's Atty. of Cook County, Labor & Employment Div., Chicago, IL, for defendants-appellees.

POSNER, Chief Judge.

Stephen Eberhardt was an Assistant State's Attorney in Cook County, Illinois. In this civil rights suit brought under 42 U.S.C. § 1983 against his supervisors, seeking both damages and equitable relief, he claims that he was fired from that position because he wrote a novel, and that to fire him for such a reason violated the right of freedom of expression conferred on him by the First Amendment. He also claims that an investigation which preceded his being fired deprived him of liberty within the meaning of the due process clause of the Fourteenth Amendment because it stigmatized him unjustly as a sexual harasser.

 The district judge dismissed the complaint, on motion by the defendants under Fed.R.Civ.P. 12(b)(6), for failure to state a claim. There is no separate judgment order, as required by Fed.R.Civ.P. 58; and the dismissal of a complaint is not in itself a final, appealable judgment, since the plaintiff may be entitled to replead or be given leave to replead. But it is plain from the tenor of the district judge's opinion and was confirmed by the parties at the oral argument of the appeal that the judge intended to terminate the lawsuit. That is all that is required to give us appellate jurisdiction. Compliance with Rule 58 is an important time-saver, heading off uncertainties about appellate jurisdiction and the occasional remand to discover whether the district judge really had finished with the case, but it is not a condition of jurisdiction. *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978) (per curiam); *Abbs v. Sullivan,* 963 F.2d 918, 923 (7th Cir.1992). A Rule 58 judgment order is evidence of finality and hence of appealability under 28 U.S.C. § 1291, rather than a sine qua non of finality.

All we have for facts is the 27–page complaint; we don't even have Eberhardt's novel, which has neither been published nor placed in the record. According to the complaint, in 1990 Eberhardt—a former policeman and an eight-year veteran of the State's Attorney's Office assigned to the felony trials division—"began working on a fictional novel involving fictitious prosecutors and other persons in the criminal justice system." He

completed a draft of the novel and sent a copy to another Assistant in the Cook County State's Attorney's Office—Judy Mondello, with whom years before he had had some undefined social relationship—"for her review and comments." Shortly after receiving the manuscript, Mondello wrote defendant O'Brien that a house described in the manuscript appeared to be her parents' home in St. Louis and that "Eberhardt must have obtained this and other information in the manuscript from following her and spying on her." O'Brien summoned Eberhardt to his office, and after asking him how much of the manuscript had been prepared on office time or at office expense—there is no indication of what Eberhardt's answer was—expressed his concern with "'office confidences' appearing in the manuscript." The complaint continues that Eberhardt explained to O'Brien that "all characters and locations in the manuscript were a consolidation of persons and places Eberhardt had become familiar with during his careers as a police officer and a prosecutor." O'Brien commented, "How can I leave you in a trial court if whatever you learn will appear in a book someday?" Eberhardt denied having harassed Mondello or invaded her privacy. He admitted that the house described in the manuscript was that of Mondello's parents and that he had obtained the description by driving past their house, but said that this had occurred during the period in which he and Mondello had had a social relationship.

At the close of the meeting O'Brien told Eberhardt that he was temporarily transferring him from the felony trials division to the special remedies unit and that he would check with Mondello to confirm Eberhardt's account of their relationship. He did so and Mondello denied ever having been alone with Eberhardt or indeed ever having been with him when there were not other Assistant State's Attorneys present. O'Brien confronted Eberhardt with this assertion and Eberhardt gave him names of people who he said would corroborate his version of his relationship with Mondello. Without checking with any of these people O'Brien directed that all the female Assistant State's Attorneys in the office be asked whether Eberhardt had sexually harassed them. According to the complaint, all the women interviewed denied any sexual harassment by Eberhardt. Because the defendants "made no effort to maintain confidentiality regarding the charges against Eberhardt," the charges became "common knowledge among personnel in the office of the State's Attorney and other persons working within the criminal justice system in Cook County, Illinois."

The complaint alleges that the charges of sexual harassment were completely false and known to be so by the defendants. Nevertheless Eberhardt was left to languish in the special remedies unit, where he had virtually no work to do. His efforts to be reassigned to the felony trials division were rebuffed, and a year after the transfer he was fired because "between vacation and sick time you've been gone quite a bit," although he had not used all the vacation and sick time to which he was entitled. The complaint alleges that the defendants shifted Eberhardt to special remedies in order to so demoralize him that he would resign, and when that failed fired him on a pretext, all to punish him for his novel, which is "constitutionally protected expression under the First Amendment to the United States Constitution."

In dismissing Eberhardt's First Amendment claim, the district judge observed that "the most favorable inference that can be drawn from the facts alleged ... is that the plaintiff has written a fictional piece which may provide interesting insight into the workings of the criminal justice system. The complaint contains no allegations that the manuscript contains speech which would inform the public about potential wrongdoing within the State's Attorney's Office or that addresses other matters of public import.... Because the plaintiff has failed to allege that the speech contained in the manuscript touched upon matters of public concern, he has failed to set out a claim for a violation of his First Amendment Rights." Yet even under the narrowest conception of a public employee's First Amendment rights, "a fictional piece which may provide interesting insight into the workings of the criminal justice system" is, prima facie, protected. That is, it is "speech" within the meaning of the amendment, although as in the case of

other constitutionally protected speech the protection is not absolute.

The "matter of public concern" formula upon which the district judge relied comes from cases in which the question was whether the public employee was merely complaining privately about matters personal to himself, such as whether he was being paid enough or given deserved promotions—complaints that while they are speech, often in a literal sense, and are entitled to some protection by the First Amendment, are remote from the amendment's central purpose of protecting the public marketplace in ideas and opinions—or whether he was whistle-blowing or otherwise "going public" with matters in which the public might be expected to take an interest. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Wilbur v. Mahan,* 3 F.3d 214, 216 (7th Cir.1993). "[T]he purpose of the 'public concern' requirement is to distinguish grievances of an entirely personal character from statements of broader interest concerning one's job, rather than to fix the boundaries of the First Amendment." *Swank v. Smart,* 898 F.2d 1247, 1251 (7th Cir.1990), paraphrasing *Flanagan v. Munger,* 890 F.2d 1557, 1563–65 (10th Cir.1989). The greater the potential social, as distinct from purely private, significance of the employee's speech, the less likely is the employer to be justified in seeking to punish or suppress it. But a fictional piece, intended for publication, that may provide insights into the operations of the criminal justice system is a public document (or at least intended to be public, for Eberhardt may fail to find a publisher) concerning a matter of intense public concern in our crime-ridden, crime-obsessed society. As we had occasion to note recently, there is a long tradition of sociological and muckraking novels, *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1233 (7th Cir.1993), and here we add that some of them were written by employees or other insiders of the institutions exposed. Examples range from Henry Adams's novel *Democracy* to the academic novels of Mary McCarthy, Bernard Malamud, and C.P. Snow, the spy novels of John Le Carré, Jay McInerney's fictional exposé of the *New Yorker* magazine, where he had been employed (*Bright Lights, Big City*), and novels by Louis Auchincloss, Scott Turow, and others about law firms, law schools—and prosecutors' offices.

■ There is a deeper problem with the district judge's analysis. As we have already intimated, it is not the case that the only expression which the First Amendment protects is expression that deals with "matters of public concern," unless this formula is understood to mean any matter for which there is potentially a public. The First Amendment protects entertainment as well as treatises on politics and public administration. Suppose Eberhardt had written not a novel set in a prosecutor's office but a love song, or a short story about a talking mouse, or a script for a television sitcom. Any of these works would be protected by the First Amendment. *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981), and cases cited there. They probably would not receive as much protection as the *Federalist Papers,* but the difference would be pertinent only to assessing the government's asserted justification for suppressing or discouraging the work. Even a "serious" work of public commentary can be suppressed or discouraged if there is a strong enough reason for doing so, for example if it contains information that if disclosed would compromise national security. *Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980) (per curiam); *id.* at 520, 100 S.Ct. at 771 (dissenting opinion); *McGehee v. Casey,* 718 F.2d 1137, 1143 (D.C.Cir.1983). The less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression. So Eberhardt's novel, whether or not it alleges wrongdoing or addresses matters of public import in some world-important sense, presumptively is protected by the First Amendment. It follows that his employer could not fire him for writing it unless the employer had a *reason*—something that might rebut the presumption of privilege. The employer could not *gratuitously* punish him for exercising freedom of speech. This is true even if—

indeed, especially if—the protected expression has nothing to do with the employee's job or with the public interest in the operation of his office. *National Treasury Employees Union v. United States,* 990 F.2d 1271, 1273 (D.C.Cir.), rehearing denied with opinions, 3 F.3d 1555 (D.C.Cir.1993). The less his speech has to do with the office, the less justification the office is likely to have to regulate it.

The elementary proposition that the government must be able to give a good reason (how good we need not decide in this case) for wanting to deter protected speech by attaching a sanction to it, *Wilbur v. Mahan, supra,* 3 F.3d at 217; *Berger v. Battaglia,* 779 F.2d 992, 999–1000 (4th Cir.1985), has been obscured by failure to consider the context in which the courts have said that the public employee complaining of infringement of his First Amendment rights must show that he was expressing himself on matters of public rather than private concern. Those cases are concerned not with drawing a line between different *forms* of protected speech—say, charges of official malfeasance versus entertainment—but with distinguishing between different *levels* of protection. Most of the speech in which people engage—in *Swank v. Smart, supra,* 898 F.2d at 1251, we gave the example of casual chitchat between a policeman and a college coed to whom he was giving a ride on his motorcycle; grousing to one's supervisor about the raise one didn't get is another example—is so remote from the central purposes of the First Amendment that an employee fired for such speech is not entitled to relief under that amendment. *Connick v. Myers, supra,* 461 U.S. at 147, 103 S.Ct. at 1690. The employer's interest in controlling such speech, meager as that interest may be, is thought to outweigh the social interest in speech so remote from the core of the First Amendment. The courts have had to separate speech that is not very valuable socially from whistleblowing and other socially valuable expressive activities of public employees, and "matter of public concern" is the label of the distinction. But a novel is not like grousing about a raise. It is comfortably within the protection of the amendment and this re-

gardless of its subject matter or its relation to the author's employment.

The defendants may have legitimate and even powerful reasons for wanting to regulate the novelistic activities of Assistant State's Attorneys even if (as cannot be determined from the complaint) Eberhardt did all his novel writing in his off hours and without using his office or any office supplies. If it is known that one of the Assistant State's Attorneys is writing a novel about the office and perhaps working into it thinly disguised depictions of the other assistants, the atmosphere of collegiality and mutual trust that is important to the activities of a prosecutor's office may be poisoned. But as the defendants have not yet filed an answer to the complaint it is altogether premature to speculate about the possibility that they may have had a legitimate reason for firing an Assistant State's Attorney for writing a novel about the office. There is no suggestion that the Cook County State's Attorney's Office has any policy on outside writing or publishing by Assistant State's Attorneys; or that, like Snepp, Eberhardt had signed a contract limiting his right to publish; or that, if the Office has imposed any such restrictions, they are valid ones. Cf. *National Treasury Employees Union v. United States, supra.*

█ Of course it is entirely possible that Eberhardt was fired not because he wrote a novel but because of the methods he employed in gathering material for it. If someone wanting to write a murder mystery decided he really ought to find out what it feels like to be a murderer and so he went out and killed someone, his punishment for murder would not raise any issue under the First Amendment. And perhaps that is the essential character of the case here. Eberhardt may have been fired not for writing a novel and not for engaging in anything usefully described as sexual harassment but simply because he exhibited outstandingly poor judgment in lurking about the home of Judy Mondello's parents, possibly conveying to her however inadvertently the impression that he was following her about, that he knew everything about her, that she could not escape his gaze. But all this is speculation. It is not as if Eberhardt's unnecessarily prolix complaint

(27 pages) contains allegations that negate his causal theory and by doing so require dismissal of his complaint, hoist by his own petard, as in *Fryman v. United States*, 901 F.2d 79, 82 (7th Cir.1990); see also *American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 724 (7th Cir.1986). In fact the complaint, by alleging that the defendants knew that Eberhardt was not guilty of any form of sexual harassment—knew that he had driven by the parents' home when Mondello and he were having a relationship, perhaps of a romantic character—implies that his writing the novel was the *only* cause of his being fired. If this is true and if there was no legitimate reason for his supervisors to discourage him from writing such a novel, he has stated a claim that his rights under the First Amendment have been violated.

■ The defendants offer a backstop defense: qualified immunity. It is premature, as well as irrelevant to the plaintiff's request for an order that he be reinstated. If the complaint is taken at face value, as we must do in light of the absence of any other source of facts, the defendants punished the plaintiff for writing a novel, without having any legitimate reason for such punishment. This is such an elementary violation of the First Amendment that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles. *Nelson v. Streeter*, 16 F.3d 145, 151 (7th Cir.1994); *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir.1992); see also *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "The easiest cases don't even arise." *K.H. through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990).

■ With respect to the plaintiff's other claim, that of a "stigmatizing" dismissal which by destroying the public employee's future employment prospects brings about a deprivation of occupational liberty, *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *McMath v. City of Gary*, 976 F.2d 1026, 1032 (7th Cir.1992); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136 (7th Cir.1984), we think the district judge was right to dismiss. Here the detail

of the complaint does defeat the pleader. The stated reason for dismissing Eberhardt was that he had been out of the office a lot because of vacation and sick leave, and there is no contention that this reason for dismissal is stigmatizing. The real reason, according to Eberhardt, is that he wrote a novel, and that is not a stigmatizing ground for dismissal either. What he is actually complaining about on this phase of the case is not either the real or the ostensible reason for his dismissal. He is complaining because the defendants conducted an investigation of a charge of sexual harassment against him in an indiscreet fashion. Such conduct does not fit into any known constitutional pigeonhole.

■ The cases holding that a stigmatizing dismissal can be actionable as a constitutional tort require that the stigmatizing ground be made public. *Bishop v. Wood*, supra, 426 U.S. at 348, 96 S.Ct. at 2079; *McMath v. City of Gary*, supra, 976 F.2d at 1033; *Clark v. Maurer*, 824 F.2d 565 (7th Cir.1987). In defamation law, it is true, "publication" has a special meaning, here satisfied even if the accusation of sexual harassment was never communicated to anyone outside the Cook County State's Attorney's Office. But to deprive a person of his liberty of occupation, the defamatory grounds for his discharge (or, as here, other defamatory statements about a former or soon to be former employee) must be made public in a broader sense, *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir.1986), akin to that required for the tort of invasion of privacy. If news of the investigation was confined to the very agency from which Eberhardt had been discharged, it could not significantly impair his prospects of obtaining employment elsewhere.

We suppose that if the defendants had instituted the investigation in the hope and expectation that news of it would leak out of the Cook County State's Attorney's Office and destroy Eberhardt's prospects for future employment in his chosen vocation as a prosecutor, this would be a form, albeit an oblique one, of the vocation-destroying defamation that is actionable as a constitutional tort under the cases that we have cited (and many more like them that could be cited).

That would be a case of deliberately although indirectly publicizing defamatory charges. We do not understand the complaint to be alleging any such thing. The allegation that news of the investigation spread outside the State's Attorney's Office signifies only—in the absence of any suggestion that the defendants *wanted* the news to spread outside— that the defendants might have done more to maintain appropriate confidentiality of what has lately become a most damaging form of accusation in our society. As the complaint puts it, the defendants "made no effort to maintain confidentiality regarding the charges against Eberhardt." Neither in his complaint nor in his briefs does Eberhardt contend that this was done with the deliberate aim of publicizing the charges to the outside world. A suit under 42 U.S.C. § 1983 for deprivation of life, liberty, or property without due process of law cannot be based on an allegation of merely negligent conduct. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion. There will be no award of costs in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.