Richard L. BROWN, Plaintiff–Appellant,

v.

DISCIPLINARY COMMITTEE OF the EDGERTON VOLUNTEER FIRE DEPARTMENT, Edgerton Fire Protection District Commission, Kenneth Crandal, et al., Defendants–Appellees.

No. 95–3443.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1996.

Decided Oct. 7, 1996.

Mary E. Kennelly (argued), Fox & Fox, Madison, WI for Richard L. Brown.

W. Scott McAndrew (argued), David J. Pliner, Bell, Metzner, Gierhart & Moore, Madison, WI, for Edgerton Fire Protection District Commission, Kenneth Crandal, Michael Reynolds, Roger Schieldt, Michael Drought, Arnold Lund, Disciplinary Committee of the Edgerton Volunteer Fire Dept., Stanley Foreman.

Before BAUER, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The difference between calling something the "Edgerton Fire Department" and the "Edgerton Fire District" might not seem monumental to the outside observer, but to Richard L. Brown it was a matter of significant public import. Brown was a volunteer firefighter for fifteen years in the Edgerton Fire Department, Edgerton, Wisconsin. When organizational changes caused the Department to change its name to the Edgerton Fire District, Brown was offended. He passed his views along to a local newspaper reporter, and soon found himself suspended and eventually terminated from his post. He responded with this lawsuit, in which he claimed that the Disciplinary Committee, the

District Commission, and its members (referred to here as "the Committee") had violated his First Amendment right to free speech and his Fourteenth Amendment right to due process. The district court dismissed the action on the ground that Brown appeared to be the only person who found the name change worthy of public discussion. We conclude that this reflected too narrow a view of the protection afforded by the First Amendment to public employee speech, and we therefore reverse and remand for further proceedings.

For many years, the City of Edgerton operated a fire department that provided fire protection services to a geographic area including both the city and the surrounding townships of Albien, Fulton, Porter, and Sumner. On May 7, 1992, the city entered into a written agreement with those townships to create a new entity, the Edgerton Fire Protection District. The towns also created the Edgerton Fire Protection District Commission, a municipality under Wis. Stat. Ann. § 66.30 (1995), which had final authority over disciplinary matters within the Department. Prior to the creation of the District, there had been a public debate about the problems of the existing structure: residents of Edgerton complained that they were subsidizing rural fire protection, and residents of the townships and rural areas complained that they had no voice in setting budgetary priorities. The new District was the response to both those problems. The Edgerton Fire Department remained in existence as a separate entity, but it became subordinate to the District. The new name began to show up around the area, including on the sign outside the headquarters building and the insignia on the fire trucks and firefighter uniforms.

Brown, as noted above, was displeased with these changes. He believed that the use of the word "District," rather than "Department," compromised the history and heritage of the fire department. The Department had been in existence for over 100 years. Some firefighters had died serving under that name, and others had retired. He felt that Edgerton, as a city sensitive to its history, would be interested in preserving

its heritage as well as possible. With this in mind, Brown first asked the president of the Fire District Commission, Jim Linsley, whether the name could be changed back to fire "Department." Linsley responded negatively. Around March 9, 1993, Brown went to the offices of the Edgerton Reporter, the local newspaper, and spoke with reporter Robert Samuelson about the name change. He asked Samuelson how one went about getting an article in the paper. Samuelson told him, and asked what the subject was; Brown replied, "I was trying to see how much support and how many people would like to see the Edgerton Fire Department name back to the Edgerton Fire Department—change it back from Edgerton Fire District to the Edgerton Fire Department."

Samuelson's interest was not piqued. Instead, he contacted the fire chief, Mark Backus, and asked him what was happening. Backus was displeased to learn about Brown's inquiry and convened a special meeting of the department on March 11, 1993. When asked why he had done it, Brown said again that he wanted to preserve the department's heritage. Following that meeting, the Disciplinary Committee (the members of which were included among the defendants in Brown's suit) voted to suspend Brown for six months, because he had "acted unjustly in going to the media." The Committee imposed several conditions on him in addition to the suspension: he was prohibited from talking about departmental topics to the public without permission from the fire chief or the Commission president; he was not given credit for fire calls or special meetings; and he was required to attend regular monthly meetings, again with no credit for his attendance. After the suspension, Brown missed five meetings in a row—April through August 1993. This prompted the Commission to take further steps. By letter of October 7, 1993, Brown was notified that the Fire Department had voted to revoke his membership outright. As was his right, Brown requested a hearing, which was held on December 2, 1993. After that hearing, at which he had the opportunity to present his case, present witnesses, cross-examine the Commission's witnesses, and subpoena witnesses under Wis. Stat. Ann. § 62.13(5), the

Commission voted to revoke Brown's membership in the Department, purportedly for failure to attend the meetings after his suspension.

The district court assumed for the sake of argument that Brown had some sort of employment relationship with the Fire Protection District, and thus that his claims should be analyzed under the cases dealing with public employee free expression rights. Considering the form, content, and context of Brown's speech, the judge concluded that it did not raise a matter of public concern. She gave two principal reasons for her ruling: first, there was no evidence that others shared Brown's concerns about the name change, and second, the name was not part of the public debate that preceded the creation of the District. Brown's failure to show that the speech was a matter of public concern meant that it was not protected under the First Amendment. The court also ruled that Brown failed to show that his due process rights were violated, because the District gave him an adequate notice and hearing. On appeal to this Court, Brown raises only the First Amendment issue.

■ This Court recently had occasion to review the law governing public employee free speech claims, in *Dishnow v. School District of Rib Lake*, 77 F.3d 194 (7th Cir. 1996). Referring to the earlier decision in *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir.1994), the court reiterated that

> when the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of "public concern," they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances-which whether or not protected by the First Amendment are too remote from its central concerns to justify judicial interference with the employment relation, ... and casual chit-chat, which is not protected by the First Amendment at all.

77 F.3d at 197 (citations omitted). A three-step sequence governs the analysis of these claims: first, would the speech be protected if uttered by someone who was not a public employee; second, is the speech something more than an unprotected personal employee grievance; and third, has the public employer shown a convincing reason to forbid the speech? *Id.* See generally *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

■ Before undertaking that analysis, we pause briefly on a potential problem with Brown's case: as a *volunteer* firefighter, did he lose anything valuable enough to give him standing to sue for his termination? We are obligated to consider the issue of standing, like any other question implicating our Article III jurisdiction, whether or not the parties have raised it. See *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1058–59 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994). The record on summary judgment indicates that the answer is yes. First, from the simple standpoint of monetary loss, Brown's termination meant that he would not qualify for the $700 annual pension given to volunteer firefighters who serve for twenty-five years. Second, Wisconsin law treats volunteer firefighters as state employees for a variety of purposes. The District Commission here had the status of a municipality, Wis. Stat. Ann. § 66.30, and the workmen's compensation law makes it clear that members of volunteer fire companies are "employees." Wis. Stat. Ann. § 102.07(7) (1996). That would make Brown an employee of the municipal fire district, no matter how much or little he was paid. See also *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993) (experience and status that often accompany a volunteer position can make the position a benefit or privi-

lege which could be taken away unconstitutionally).

Brown suffered both an immediate and a longer-term adverse consequence from his effort to raise the issue of the Department's name change. The immediate consequence was his six-month suspension from service, which was admittedly ordered because he contacted the reporter. The minutes of the December 2, 1993, meeting frankly report that Brown's first suspension was "for going to the media without going through the proper channels." Had that not occurred, he never would have been required to engage in the penance of attending six months' worth of meetings without the right to perform services for the Department or to receive credit for his attendance. We therefore do not believe that the Committee's stated reason for the eventual termination—Brown's failure to attend these meetings—can save it here. As the Committee seems to concede, Brown had never had a problem with attendance prior to his suspension. His reason for missing the meetings during the time he was suspended was simple: he worked during the night (10:00 p.m. to 6:00 a.m.) and preferred to rest during the meeting time (ranging from 6:00 p.m. to 7:30 p.m.) if he could not work as a firefighter or get "credit" for his meeting attendance. Thus, if the original penalty had never been imposed, he never would have had a problem with attendance. In sum, Brown had concrete interests at stake in his position with the Department, and he suffered injury in fact. This is enough to allow the case to go forward.

■ Proceeding through the steps *Dishnow* requires, we consider first whether Brown's speech would have been protected if uttered by a non-employee. Suppose, for example, the widow of one of the firefighters who had died in the line of duty had objected to the change in the name (and all that it signified for the change in geographic scope and autonomy of the Department). Her contact with a reporter surely could not have been squelched. Other people might have considered her concern about the name as hypersensitive, but it does not take much to see it as a symbol of the broader change the Department had recently undergone—some-

thing which everyone agrees was a matter of public concern. Even if we restrict our sights to the difference between "Dept." and "Dist.," as the district court did, this is a quintessential public question: what will the people name one of their municipal units? See, *e.g., Eberhardt v. O'Malley,* 17 F.3d at 1026 (crime novel written by prosecutor presumptively protected by First Amendment "whether or not it alleges wrongdoing or addresses matters of public import in some world-important sense"); *Dunn v. Carroll,* 40 F.3d 287 (8th Cir.1994) (fireman's wearing American flag patch on uniform during military buildup in Persian Gulf constituted "speech" on a matter of public concern); *Eiland v. City of Montgomery,* 797 F.2d 953 (11th Cir.) (poem critical of Mayor posted by police corporal during election year was speech on matter of public concern), *reh'g denied,* 803 F.2d 1185 (1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). As we noted in *Dishnow,* the First Amendment does not protect only debate on issues that will affect the future of Global Civilization; people in a locality are entitled to air more parochial concerns.

■ The fact that Brown was not leading a group of name change protesters does not change the public nature of his speech. We noted in *Smith v. Fruin,* 28 F.3d 646, 653 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995), that "[i]f a public employee speaks as a citizen on a matter of public concern, her speech is entitled to First Amendment protection whether she speaks as a lone individual or as the representative of many others...." See also *Biggs v. Village of Dupo,* 892 F.2d 1298, 1302 (7th Cir.1990) (speech on matter of public concern "did not become unprotected simply because it include[d] complaints personal to" police officer who spoke to newspaper); *Knapp v. Whitaker,* 757 F.2d 827, 840 (7th Cir.) (comments regarding mileage allowances and grievance procedure were on matter of public concern even though they stemmed from teacher's own experiences), *appeal dismissed and cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). As Brown's lawyer pointed out at oral argument, Brown never had the chance to learn if any-

one else in the community shared his views, because the paper never published the article. The First Amendment would be severely compromised if we required ideas to pass a popularity threshold before they won protection. There is no such requirement, even for ideas that do not seem destined to attract a large following, since "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). We conclude, therefore, that Brown passes the first of the *Dishnow* hurdles.

■ Second, we must decide whether Brown was voicing a purely personal employee grievance. It is useful to consider what types of grievances have earned this characterization before coming to any conclusion. In *Connick,* the Supreme Court held that all but one of the questions in a questionnaire a disgruntled assistant district attorney was circulating throughout her office were purely private. The private issues included those pertaining to the confidence and trust her coworkers had in their supervisors, the level of office morale, and the need for a grievance committee. 461 U.S. at 148, 103 S.Ct. at 1690–91. In *Smith,* a police detective's complaints about smoke in the workplace pertained only to his own physical discomfort and distaste for secondhand smoke; he expressly disclaimed any broader agenda, and again the court concluded they were private. 28 F.3d at 653. Finally, what the court characterized as "idle chit-chat" between people was not entitled to substantive First Amendment protection in *Swank v. Smart,* 898 F.2d 1247 (7th Cir.1990), although certain procedural rights arose based on the use to which that conversation was put.

Whatever else Brown's speech was, it was not something that pertained to workplace conditions, like that in *Connick* and *Smith,* and no one has argued it was private conversation, like that in *Swank.* He was trying to excite public interest in the name change. Improbable though the hypothetical may be, if the City of Chicago decided to join together in a consortium with the neighboring suburban communities, and all the public references to the City suddenly became references to the "Chicago District,"

we suspect that some people would raise exactly the same complaint that Brown did. Juliet asked herself "what's in a name," in her famous soliloquy, *Romeo and Juliet,* Act II, scene ii, but the outcome of the play showed that a great deal was unfortunately still left in the names Capulet and Montague. To Brown, at least, the name of the Fire Department meant a great deal to the City of Edgerton as a whole. His desire to communicate that concern was not a mere private employee grievance.

■ Finally, we must consider whether the Committee had a convincing reason to forbid Brown's speech. This balancing of the interest in freedom of expression against the employer's interest is a matter for the court, not the jury. See *Waters v. Churchill,* 511 U.S. at ——, 114 S.Ct. at 1891 (1994); *Connick v. Myers,* 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10; *Rankin v. McPherson,* 483 U.S. at 385 n. 8, 107 S.Ct. at 2897 n. 8 ("public concern" determination is either question of law or at least subject to constitutional fact review); *Dishnow,* 77 F.3d at 198; *Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1111, 130 L.Ed.2d 1076 (1995) ("public concern" analysis is matter of law which Court of Appeals reviews *de novo*). Thus, on our *de novo* review from the district court's decision granting summary judgment to the defendants, we may also review this question to see if the record clearly shows that the District's interest outweighed Brown's. If we thought this were true, it would be an alternative ground on which to affirm the district court; the Committee is therefore mistaken when it urges us not to look at this issue because the district court saw no reason to reach it.

The record comes nowhere near showing that the Fire District had a convincing reason to suppress Brown's speech. Indeed, it is hard to see how a debate on the proper name for the District (or Department) would be disruptive at all, although we do not mean to foreclose further development of this subject on remand. By sending this case back for further proceedings, we do not trivialize the First Amendment; we vindicate its guarantee that citizens are entitled to voice their

opinions on a wide range of subjects, even including the names they wish to confer upon their public bodies. On remand, the district court may conclude that some or all parts of the *Dishnow* test are established in Brown's favor as a matter of law, but we leave that review of the record to it in the first instance. The judgment below is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.