In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-1398

BRYAN CRAIG,

*Plaintiff-Appellant,*

*v.*

RICH TOWNSHIP HIGH SCHOOL DISTRICT
227, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-07581 — **Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 10, 2013 — DECIDED DECEMBER 3, 2013

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In 2012, Bryan Craig self-published a short book of adult relationship advice entitled "It's Her Fault." And when we say "adult," we mean it in every sense of the word—in his book, Craig repeatedly discusses sexually provocative themes and uses sexually explicit terminology. Eventually, Craig's employer, a school district located in Chicago's south suburbs, learned of the publica-

tion of Craig's book and decided to terminate his employment because of it. Craig sued the school district, the school board, and several board members under 42 U.S.C. § 1983 alleging that they improperly retaliated against him for engaging in speech protected by the First Amendment. The district court dismissed the suit for failure to state a claim because, in its view, "It's Her Fault" did not address a matter of public concern and was not entitled to First Amendment protection.

While we respectfully disagree with the district court's assessment of the "public concern" issue, we ultimately uphold the dismissal of Craig's claim on an alternative basis. While full of objectionable content, Craig's book deals with adult relationship dynamics, an issue with which a large segment of the public is concerned. However, we affirm the district court's dismissal because the allegations of Craig's complaint and the documents he relies upon to support his claim establish that the school district's interest in ensuring effective delivery of counseling services outweighed Craig's speech interest. The school district reasonably predicted that "It's Her Fault" would disrupt the learning environment at Craig's school because some students, both female and male, who learned of the book's hypersexualized content would be reluctant to seek out Craig's advice. Craig has effectively pled himself out of court by asserting allegations and incorporating documents sufficient to establish that the school district's interest in restricting his speech outweighed his interest in publishing his book. We therefore affirm the district court's judgment.

## I. BACKGROUND

Until recently, Bryan Craig was a tenured guidance counselor at Rich Central High School in Chicago's south suburbs. In addition to advising students, Craig served as the coach for Rich Central's women's varsity, junior varsity, and freshmen basketball teams.[1]

In July 2012, while employed at Rich Central, Craig self-published a book entitled "It's Her Fault" which is a collection of Craig's relationship advice for women. As Craig tells it, while "counseling people of all ages and races [he] found himself saying the same things over and over to women during sessions." Over the course of "provid[ing] counseling to thousands of students, parents, clients, and friends," Craig discovered "a trail of popcorn leading back to it being her fault." During these encounters with female advice-seekers, Craig determined "that women act based on emotion alone instead of emotion plus intellect" which leads to women be-

---

[1] When reviewing a motion to dismiss, a court generally considers the factual allegations of the complaint and any reasonable inferences that can be drawn from those allegations. *See Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). But a court may also examine information from documents referenced in the complaint that the plaintiff relies upon to support its claim. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) ("What makes it appropriate for us to consider the documents … is that [plaintiff] not only cited them in the body of her complaint, but she has, to some degree, relied on their contents as support for her claims."). Consistent with these principles, our factual summary includes information drawn from documents Craig mentioned in his complaint and upon which his claim depends: his book, the letter from school district superintendent Donna Leak, as well as the Charges and Bill of Particulars that Leak attached to her letter. *See, e.g.*, Compl. ¶¶ 14, 17-23.

ing unable to obtain the type of relationship they want. By publishing the book, Craig hoped to give women "the road map to having the upper hand in a relationship with a man."

Parts of Craig's book contain garden-variety relationship advice. For example, Craig highlights the need for discretion between partners in order to develop trust in a relationship. According to Craig, "our biggest downfall in relationships is sharing too much information with friends or associates." Craig also writes of the importance of being a good listener and instructs women to "[p]ay very close attention to content when having serious conversations with your man."

But not all of Craig's advice is this mundane. Much of "It's Her Fault" is dedicated to exploring provocative topics. For example, Craig devotes one chapter to informing women of the effectiveness of using sex appeal to obtain power in a relationship. Craig instructs by way of example:

> Fellas, you ever notice how nice your girl is around payday, or how your d—k feels even better to them when they need something? Noooooo, most men don't notice, so, women, keep using that skill.

Such tactics are effective, in Craig's mind, because all "[m]en have sexual radar," including Craig himself. Despite being "beyond the highest caliber of men," Craig nevertheless confesses "a weakness for cleavage" and other portions of a woman's anatomy.

In another part of the book, Craig encourages his female readers to engage in "a certain level of promiscuity before marriage[:]"

> Don't go hoeing around the world, but experience things. Women: discover different penis sizes, differ-

ent races and ethnicities … Discover what you like so you can prepare yourself before going into the wonderful world of marriage.

Craig uses sexually explicit terminology throughout "It's Her Fault." One particularly graphic passage relates to Craig's argument that women must submit to their male partners in order to prevent them from being unfaithful:

> Let[']s enter the wonderful world of submissiveness. Yeah I know ladies, you all hate that s--t. However, it must be in place in order for us to feel some type of power. Say more "yes" and a lot less "no." He's your man, go ahead and let him turn you every which way … [g]ive him oral sex without making the "ugh" face. So what if you're tired, ask him if he wants a meal.

In another part of the book, Craig delves into a comparative analysis of the female genitalia of various races which goes into an excruciating degree of graphic detail.

Craig references his employment at Rich Central throughout "It's Her Fault." In the introduction, Craig establishes his qualifications as an advice-giver by relating the significant amount of time he has spent interacting with women. Aside from his relations with female family members, Craig cites his dealings with women when "coach[ing] girls basketball, work[ing] in an office where I am the only male counselor, and [being] responsible for roughly 425 high school students a year, about half of whom are females." Craig also referenced his counseling of students in the acknowledgments section, thanking his "students and clients who consistently reach out to me during rough times in the world of relationships: Keep listening and learning."  More-

over, another Rich Central teacher, Kylie Gregor, identified herself as the author of the foreword to "It's Her Fault" and vouched for the value of Craig's advice.

Eventually, school board officials became aware of "It's Her Fault." On September 14, 2012, the Superintendent of the Rich Township High School District 227, Donna Leak, sent Craig a letter informing him that the District had received "concerns from members of the School District community" regarding his book. Leak attached two documents, a list of Charges and a Bill of Particulars (collectively, the "Charges"), and notified Craig that she planned to recommend to the Board of Education of Rich Township High School District 227 (the "Board") that he be discharged. Among other considerations, the Charges stated that: (1) the publication of Craig's book "ha[d] caused disruption, concern, distrust and confusion among members of the School District community;" (2) Craig violated the School Board's Policy "prohibit[ing] conduct that creates 'an intimidating, hostile, or offensive educational environment;" and (3) "Craig failed to present [himself as] a positive role model and failed to properly comport himself in accordance with his professional obligations as a public teacher." On September 18, 2012, the Board adopted the Charges and issued a resolution finding cause for Craig's discharge.

Craig filed suit against the District, the Board, Leak, and various Board members (collectively, "Defendants") under 42 U.S.C. § 1983. In his complaint, Craig alleges that his discharge was in retaliation for a protected exercise of his First Amendment rights. The district court dismissed Craig's complaint for failure to state a claim. In its ruling, the district court concluded that "It's Her Fault" was not entitled to First

Amendment protection because it did not address a matter of public concern. Instead, the district court found that the book was "little more than a lurid account of plaintiff's own sexual preferences and exploits." Craig now appeals.

## II. ANALYSIS

On appeal, Craig argues that the district court incorrectly dismissed his First Amendment retaliation suit for failure to state a claim. "We review de novo a district court's dismissal under Rule 12(b)(6), construing factual allegations and any reasonable inferences in the light most favorable to the plaintiff." *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782 (7th Cir. 2013).

### A. "It's Her Fault" Addresses a Matter of Public Concern

Craig contends that the district court erred in concluding that "It's Her Fault" was not entitled to First Amendment protection because it did not involve a matter of public concern. An actionable "First Amendment retaliation claim by a public employee requires, at a minimum, that the speech being retaliated against be constitutionally protected, which means that the speech must involve a matter of 'public concern.'" *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013). Whether an employee's speech implicates a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

Despite its lofty terminology, the "matter of public concern" inquiry does not require that speech relate to an issue of exceptional significance in order to be entitled to prima

facie First Amendment protection. "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (per curiam). But the speech need not address a topic of great societal importance, or even pique the interest of a large segment of the public, in order to be safeguarded by the First Amendment. *See Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996) (holding that speech need not address a "matter[] of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy[,]" in order to relate to a matter of public concern). Rather, an employee who "participat[es] in a public dialogue on matters of interest to the public" will "place his speech, prima facie, within the protection of the First Amendment." *Id.*; *see also Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ("[I]t is not the case that the only expression which the First Amendment protects is expression that deals with 'matters of public concern,' unless this formula is understood to mean any matter for which there is potentially a public."). "That the public was not large, that the issues were not of global significance … d[oes] not place [] speech outside the orbit of protection." *Dishnow*, 77 F.3d at 197. Moreover, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).[2]

---

[2] We note that this case does not present a set of facts to which courts have typically applied the "matter of public concern" analysis. The test was designed to help courts distinguish between protected and unpro-

(continued…)

Our opinion in *Dishnow* provides a good example of this principle in action. In that case, a school guidance counselor

---

tected speech when a public employee speaks out about her employer's policies, conduct, or other issues more directly related to her public employment. *See, e.g., Connick*, 461 U.S. at 144-147 (evaluating whether questionnaire submitted by assistant district attorney requesting input on various district attorney's office policies involved public concern or "matters only of personal interest"); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 574 (1968) (holding that teacher's letter to the editor regarding employer school board's funding decisions was an "issue[] of public importance" entitled to First Amendment protection); *Kristofek*, 712 F.3d at 983-85 (evaluating whether police officer addressed matter of public concern in discussing superiors' handling of politically connected resident's arrest). When the employee's expression centers on a topic intimately related to her job, the public concern formula helps courts to distinguish between (1) an employee's purely personal gripe about how the employer's policy affects the employee (generally not entitled to protection); and (2) an employee's attempt to notify the public of a work-related issue about which the public is concerned (generally entitled to protection). *Eberhardt*, 17 F.3d at 1026.

When an employee speaks out about her public employer's actions, the public concern inquiry focuses the court's attention on "the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985). The subject matter of the expression is relevant to this analysis. We doubt, for example, that an employee's letter to the editor concerning her dislike of the color of the paint on the walls of her office would qualify as a matter of public concern based on the public's lack of interest in the topic. But the subject matter of the speech is just one of many factors for the court to consider in this context. *See generally Connick*, 461 U.S. at 147-48 ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.").

"was fired because he had written certain articles, which the school board considered scandalous or disreputable, for a local newspaper." *Dishnow*, 77 F.3d at 196. One article, an installment in a series called "Rib Lake High School Counselor's Corner," referenced the plaintiff's previous alcohol consumption and cigarette smoking. *Id.* at 198. We concluded that this article (as well as others written on other topics) related to a matter of public concern even though they were not "vital to the survival of Western civilization." *Id.* at 197.

While Craig's book arguably contains more provocative content than the article at issue in *Dishnow*, we think both works relate to matters of public concern. The district court correctly observed that some parts of "It's Her Fault," such as Craig's description of his own sexual exploits, would not relate to a matter of public interest if viewed in isolation. But we respectfully disagree with the district court's ultimate conclusion that just because the book happened to "touch[] on a matter of public interest (relationships between men and women) does not mean that it addresses a matter of public concern." That is precisely what public concern means—speech directed to the public need only address a "matter[] in which the public might be interested" in order to be eligible for First Amendment protection. *Id*. Viewed as a whole, "It's Her Fault" addresses adult relationship dynamics, a subject that interests a significant segment of the public. The proliferation of advice columns dealing with precisely this topic is a testament to its newsworthiness. *See, e.g.,* Amy Dickinson, *Ask Amy: Wife May Seek Answers Elsewhere for Sexual Drought in a Marriage*, DENVER POST, Oct. 7, 2013, http://www.denverpost.com/askamy/ci_24242904/dear-amy-ife-may-seek-answers-elsewhere-sexual; Carolyn Hax, *Carolyn Hax: When Partners Don't Share Same Idea of Comforta-*

*ble*, WASHINGTON POST, Oct. 5, 2013, http://www.washingtonpost.com/lifestyle/style/carolyn-hax-when-partners-dont-share-same-idea-of-comfortable/2013/10/01/a0679166-253c-11e3-ad0d-b7c8d2a594b9_story.html. The fact that Craig's book dealt with a subject of general interest to the public was enough to establish prima facie First Amendment protection. *Eberhardt*, 17 F.3d at 1026. We believe the district court erred in concluding otherwise.

The district court also reasoned that dismissal of Craig's claim was warranted because "It's Her Fault" was similar to speech that the Supreme Court determined did not relate to a matter of public concern in *City of San Diego v. Roe*, 543 U.S. 77 (2004) (per curiam). We disagree with that comparison. *Roe* dealt with a police officer's creation of sexually explicit videos depicting the officer "stripping off a police uniform and masturbating." *Id.* at 78. Whatever one may think of Craig's book, it is fundamentally different in character from the "debased parody" at issue in *Roe*. *Id.* at 81-82. Craig's book, though provocative, does address the structure of adult relationships, an issue with which some segment of the public would be interested. Roe's video did not concern any issue of any sort, much less "a subject of general interest and of value and concern to the public." *Id.* at 83-84. By equating Roe's video with Craig's book, the district court did not account for the fundamental differences between the two expressions.

## B. Defendants' Interests in Restricting "It's Her Fault" Outweighed Craig's Speech Interest

Even though Craig's speech implicated an issue of public concern, Defendants argue that we can still affirm the dismissal of Craig's claim because Defendants' interests in re-

stricting Craig's speech outweighed Craig's interest in making his views known. We may affirm a district court's dismissal order on any basis supported by the record. *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 n.2 (7th Cir. 2009).

An employer does not necessarily violate the First Amendment by discharging an employee that speaks out on a matter of public concern. "The government is entitled to restrict speech that addresses a matter of public concern 'if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service.'" *Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009) (quoting *McGreal v. Ostrov*, 368 F.3d 657, 675-76 (7th Cir. 2004)). The employer bears the burden of justifying its restriction on its employee's speech. *Connick*, 461 U.S. at 150.

As an initial matter, Craig argues that Defendants' burden is particularly rigorous in this case because Craig's speech occurred outside of work on a topic unrelated to his employment. In support, Craig cites the Supreme Court's decision in *United States v. Nat'l Treasury Employees Union ("NTEU")*, 513 U.S. 454 (1995). In *NTEU*, the Court was confronted with a prospective prohibition on low-level federal employees' receipt of payment for speech on topics totally unrelated to their employment. *Id.* at 457-59. In rejecting the ban, the Court held that an employer must provide a justification "far stronger than mere speculation" in order to restrict employee speech that "has nothing to do with their jobs." *Id.* at 465, 475.

*NTEU* is of no help to Craig because he took "deliberate steps to link" his book with his work as a guidance counselor at Rich Central. *See Roe*, 543 U.S. at 80-81 (holding that reliance on *NTEU* "was seriously misplaced" when plaintiff deliberately linked speech to public employment). Craig included a number of references to his job as a high school guidance counselor within the pages of his book: (1) in the introduction, he informs the reader that "I coach girls basketball, work in an office where I am the only male counselor, and am responsible for roughly 425 high school students a year, about half of whom are females;" (2) in the acknowledgments, he thanks "students and clients who consistently reach out to me during rough times in the world of relationships: Keep listening and learning;" (3) another Rich Central teacher, Kylie Gregor, wrote the foreword; and (4) he describes his experiences "counseling people of all ages and races" and "provid[ing] counseling to thousands of students, parents, clients, and friends." Because of Craig's conscious choice to connect "It's Her Fault" to his counseling position at Rich Central, his speech relates to his employment and *NTEU* does not apply.

Instead, the *Connick-Pickering* balancing test determines whether Defendants' interests in disciplining Craig outweighed his First Amendment speech rights. "[T]he proper balance of these competing interests is a question of law." *Chaklos*, 560 F.3d at 715. In evaluating Defendants' asserted interests under this rubric, we "focus[] on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388. The disruption need not come to pass

in order for the employer to take action; we "give substantial weight to government employers' reasonable predictions of disruption." *Crue v. Aiken*, 370 F.3d 668, 685 (7th Cir. 2004); *see also Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1014 (7th Cir. 1997) *(*"Where employee speech carries the potential to be disruptive, the public employer must have the ability to move quickly" to discipline the employee). But an employer's assessment of the possible interference caused by the speech must be reasonable—"the predictions must be 'supported with an evidentiary foundation and be more than mere speculation.'" *Chaklos*, 560 F.3d at 715 (quoting *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 944 (7th Cir. 2004)).

The degree of disruption or potential disruption necessary to justify the restriction varies depending on a number of factors. One consideration is the content of the speech: "[A] stronger showing may be necessary when an employee's speech more substantially involves matters of public concern." *McGreal*, 368 F.3d at 681-82. Conversely, "[t]he less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression." *Eberhardt*, 17 F.3d at 1026. Courts must also consider the nature of the employee's responsibilities. An employer may have more leeway in restricting the speech of an employee whose position requires contact with the public. *See Rankin*, 483 U.S. at 390-91. The manner, time, and place of the employee's speech are also relevant to the analysis; "[e]mployee speech which transpires entirely on the employee's own time … bring[s] different factors into the *Pickering* calculus." *Connick*, 461 U.S. at 152, 153 n.13.

After reviewing Craig's complaint and the other documents that he relies upon to establish his claim for relief (i.e., his book and the Charges), we conclude that Defendants' interests in remedying the potential disruption caused by his book outweighed Craig's speech interest. Essentially, the Charges reflect that Defendants based their decision to terminate Craig's employment on a prediction that "It's Her Fault" would "create[] an intimidating … educational environment" at Rich Central. Defendants' assessment of how Craig's students, and particularly his female students, would respond upon reading or hearing about the hypersexualized content of his book looms large in our analysis. The fact that Craig works closely with students at a public school as a counselor confers upon him an inordinate amount of trust and authority. *See generally Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("Families entrust public schools with the education of their children … Students in such institutions are impressionable and their attendance is involuntary."); *see also Melzer v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, 336 F.3d 185, 198 (2d Cir. 2003) ("[W]e note that we conduct our evaluation of appellant's rights versus governmental interest bearing in mind his position as a teacher in a public school. This position by its very nature requires a degree of public trust not found in many other positions of public employment."). Particularly as a guidance counselor, Craig must maintain a safe space for his students in order to ensure they remain willing to come to him for advice. If Craig fails to create the appropriate environment for his students, they will not approach him and he cannot do his job.

We think Defendants reasonably predicted that "It's Her Fault" would interfere with the learning environment at Rich Central. For starters, Defendants reasonably inferred

that some Rich Central students and parents were aware, or would soon become aware, of the content of Craig's book. The book was self-published and the allegations do not suggest any age restriction that would prevent students from accessing the book. In addition, Craig's complaint quotes a letter from the District Superintendent that cited "concerns from members of the School District community regarding the publication of your book." Compl. ¶ 18. Moreover, Craig anticipated that his students would read "It's Her Fault"— why else would he thank his "students and clients who consistently reach out to me during rough times in the world of relationships" and encourage them to "[k]eep listening and learning"?

When faced with the inevitability of Craig's book becoming common knowledge at Rich Central, Defendants reasonably gauged how students' response would impact conditions at the school. For example, we can easily see how female students may feel uncomfortable seeking advice from Craig given his professed inability to refrain from sexualizing females. In his book, Craig confesses a "weakness for cleavage" and another portion of a woman's anatomy and admits that this momentarily distracts him during his encounters with women. Knowing Craig's tendency to objectify women, Defendants could reasonably anticipate that some female students would feel uncomfortable reaching out to Craig for advice. Indeed, some students may forego receiving the school's counseling services entirely rather than take the risk that Craig would not view them as a person but instead as an object. Defendants had an interest in terminating Craig's employment in order to ensure effective delivery of counseling services to female students at Rich Central.

Moreover, Defendants reasonably expected that some students would be apprehensive about asking Craig for help given his views on women. For example, Craig asserts that women do not succeed in relationships because of their tendency to "act based on emotion alone instead of emotion plus intellect." Is it unreasonable to think a female Rich Central student who learned that Craig believed women are not inclined to rational thought may decide against visiting his office for career or other advice? We think not. Nor would it be unreasonable to believe a high school girl would keep her relationship problems to herself knowing that Craig stressed in his book the importance of a woman's sexual "submissiveness" to her male partner. These portions of "It's Her Fault" addressed subjects inextricably related to issues for which a female high school student may seek the advice of her guidance counselor. Defendants reasonably concluded that some of these students, knowing Craig's views on these topics, would decline to ask for his help.

Defendants' interests in protecting the integrity of counseling services at Rich Central dwarfed Craig's interest in publishing "It's Her Fault." Although Craig's book touched on a matter of public concern, his view of relationships is not the sort of topic of expression that Defendants would require a compelling reason to restrict. *See Eberhardt*, 17 F.3d at 1027 ("The less serious, portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression."). In light of the minimal weight of Craig's speech interest, we conclude that Defendants' interests in preventing a likely disruption of their guidance counseling service was sufficient to justify Craig's discharge. Craig's termination did not offend the First Amendment.

Craig argues that upholding his termination based on the reaction of students and parents would amount to an impermissible "heckler's veto" in which unpopular speech is silenced by the possibility of the community's reaction to it. *See generally Feiner v. New York*, 340 U.S. 315, 320 (1951) ("We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker."). But this argument does not account for the unique relationship between Craig and his students at Rich Central or the nature of his speech; his students are not "outsiders seeking to heckle [Craig] into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function." *Melzer*, 336 F.3d at 199. Given the nature of this case, we think it appropriate to consider Defendants' interests in preserving a safe counseling environment at Rich Central as part of our analysis.

Craig also maintains that we cannot affirm the dismissal of his suit on this ground because the record is not developed enough to weigh Defendants' and Craig's respective interests. We have previously noted that this analysis "can seldom be done on the basis of the pleadings alone." *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002); *see also Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997) ("Normally, application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery."). But this is one of those rare "case[s] where a plaintiff, by pleading too much, has pled [him]self out of court." *Khuans*, 123 F.3d at 1016. By incorporating "It's Her Fault" and the Charges into his allegations, Craig provided us with an adequate basis to perform the *Pickering* balancing test. While most First Amendment retaliation claims will not be amenable to resolution on the pleadings, Craig's complaint

and supporting documents place this case in the category of the exception rather than the rule.

### III. CONCLUSION

The district court's judgment is AFFIRMED.