AMBRO, Circuit Judge,
dissenting.
My colleagues focus on Ms. Munroe’s claim that she was retaliated against for authoring offensive blog posts. This is an issue that is closer than they suggest. However, I need not deal with it, as there is more to Munroe’s lawsuit than blog posts to friends that became public. A critical component is the allegation that the TV and print interviews Munroe gave following her suspension by the School District factored into its discharge decision 15 months later. Unexplainably, the District Court declined to address this argument, saying only in a footnote that, even if it had considered the interviews, that wouldn’t have changed its decision to enter summary judgment. See Munroe v. Cent. Bucks Sch. Dist., 34 F.Supp.3d 532, 538 n. 65 (E.D.Pa.2014). That is not very satisfying. If Munroe had a First Amendment right to say her piece before a national *481 audience, and no doubt she did (even the School District acknowledged this), then summary judgment is inappropriate to the extent her TV appearances, coupled with her comments made to print media, played a role in her dismissal and the School District wouldn’t have taken the same action absent them. See Miller v. Clinton Cnty., 544 F.3d 542, 548 (3d Cir.2008).
Like the District Court, my colleagues duck this argument. Their out, however, is that Munroe didn’t “devote[] much attention to the subsequent media coverage,” Maj. Op. 470 n. 7, and provided “essentially no evidence regarding the content of the[ ] interviews besides [her] general characterization of them,” id. at 470. Because I do not share that assessment and would reverse to allow a jury to consider whether Munroe’s interviews with the media contributed to the allegedly retaliatory dismissal, I respectfully dissent.
The first order of business is to determine whether Munroe adequately preserved the claim that she was retaliated against for discussing her suspension with various news organizations. Parting ways with the conclusion of my colleagues, see Maj. Op. 470-71 n. 7, I think the answer is a resounding yes. Though Munroe may not have made the claim the focus of her case, she certainly raised it at every stage in the District Court and again on appeal. In her complaint, she alleges that the School District punished her for appearing on “CBS, ABC, NBC, CNN, Fox News” and giving interviews to, among others, “Time Magazine, Reuters, the Associated Press, [and] the Philadelphia Inquirer,” and that all these appearances “were protected under the First Amendment.” Am. Compl. ¶¶ 23-29. Likewise, her response to the School District’s summary-judgment motion argues that she “engaged in two types of speech, each of which [is] protected under the First Amendment[:] First, [she] blogged to her friends and family about her experiences at CB East.... [;][and] [s]econd, [she] engaged the media in a very public debate about her blog and the Education Debate discussed in [it].” PL’s Opp’n Defs.’ Mot. Summ. J. 15-16. And the District Court apparently thought enough of the argument to address it (though only in a footnote), positing that “the analysis would not change ... upon consideration of the interviews [Munroe] gave to the media.” Munroe, 34 F.Supp.3d at 538 n. 65.
Finally, on appeal in the section of her brief titled “Statement of the Issue Presented for Review,” Munroe poses the following question: “Did the District Court err in holding that a public school teacher’s opinions about matters of public concern, published in her blog and stated in interviews to various media outlets, were unworthy of First Amendment ... protection under the Pickering v. Board of Education [391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ] balancing test?” Munroe Br. 1 (emphasis added). She also addresses the claim in the section of her brief titled “Rulings Presented for Review,” Munroe Br. 14, and develops her argument in later sections, see id. at 26 (asserting that her media appearances implicated a matter of public concern), id. at 28 (pointing out that “there was no evidence offered to demonstrate that [her] blog entries, or her interviews with the media, prevented her from doing her job as a high school English teacher” (emphasis added)). Even the School District deems Munroe’s argument about the media interviews important enough to address. It contends that the interviews shouldn’t receive First Amendment protection and, in any event, “there is no genuine issue of any material fact that Plaintiff would have been terminated even in the absence of her blog and media tour.” School Dist. Br. 51 (emphasis added). In *482 this context, Munroe has adequately raised, both before the District Court and on appeal, whether her media interviews were a reason for the retaliation she alleges. I thus move to the merits.
To succeed on her claim, Munroe must establish that the interviews were “protected by the First Amendment and ... [were] a substantial or motivating factor” in the allegedly retaliatory discharge. Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir.2014); see also Miller, 544 F.3d at 548. If she succeeds, the burden shifts back to the School District to show it would have fired her regardless whether she had told her story before a national audience. The First Amendment question — which, per Pickering, balances “the interest in freedom of expression against the employer’s interests[ — ]is to be done by the judge, not the jury.” Dishnow v. Sch. Dist. of Rib Lake, 77 F.3d 194, 198 (7th Cir.1996) (Posner, J). The causation issues, by contrast, the jury decides. See Watters v. City of Phila., 55 F.3d 886, 892 n. 3 (3d Cir.1995).
The threshold issue in determining if Munroe’s speech was protected by the First Amendment is whether her interviews with the national media implicated a matter of public concern. See Craig v. Rich Twp. High Sch. Dist. 227, 736 F.3d 1110, 1115 (7th Cir.2013). If she can show this, the School District’s interest in promoting an “effective and efficient” learning environment is balanced against Munroe’s interest in commenting on her suspension. Id. at 1118 (quoting Chaklos v. Stevens, 560 F.3d 705, 714 (7th Cir.2009) (internal quotations marks omitted)). The outcome of that test, called Pickering balancing, yields the answer to whether the First Amendment protects Munroe’s TV appearances and print interviews.
On the public-concern question, I see no difficulty (nor apparently do my colleagues, see Maj. Op. 470-71) in concluding that Munroe’s TV appearances involved a matter of “legitimate news interest,” San Diego v. Roe, 543 U.S. 77, 84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam), or a matter “in which the public might be interested,” Dishnow, 77 F.3d at 197. See also Eberhardt v. O’Malley, 17 F.3d 1023, 1026 (7th Cir.1994) (Posner, J.) (“The First Amendment protects entertainment as well as treatises on politics and public administration.”). The relevant sequence of events is instructive.
After the public learned of Munroe’s blog, Central Bucks High School East (“CB East”) Principal Abram Lucabaugh moved swiftly to suspend her and issued a televised statement explaining the School District’s decision to do so. Caught off guard by the public announcement, Mun-roe “felt ... it was necessary to share [her] side of the story.” Munroe Dep. Tr. 58:5-12. Luckily for her, the suspension became a national news story, and when it did a number of highly prominent news programs invited her to discuss the situation on live TV. Among them were ABC’s Good Morning America and Fox News’s Fox and Friends and Justice with Jeanine. Time Magazine and The Philadelphia Inquirer, among others, likewise wanted the scoop. While Munroe maintains she focused on whether “today’s youth is overindulged, underworked, and self-entitled” and whether “their parents and schools have been complicit in creating this result,” Pl.’s Reply Mem. Law Opp. Defs.’ Mot. Summ. J. 3, the School District argues otherwise. It contends that Munroe used the interviews to defend herself, not to engage in a public debate. The likely answer is a combination of both, but the key is that Munroe’s media tour focused on an event that had already captured the public’s attention: the suspen *483 sion of a public school teacher for criticizing her students on a publicly available blog. As one prominent publication put it, Munroe found “herself in the middle of a swirling online debate — not over what she did, but over what she said about the sometimes harsh realities of the 21st century classroom.” Kayla Webley, How One Teacher’s Angry Blog Sparked a Viral Classroom Debate, TIME (Feb. 18, 2011), http://content.time.eom/time/printout/0, 8816,2052123,00.html. Munroe’s intimate familiarity with the facts made her account all the more newsworthy. Viewed in that light, Munroe’s failure to introduce in court a play-by-play of her media appearances is of no consequence.
Having concluded that Munroe’s media tour implicated a matter of public concern, I turn to the Pickering balancing portion of the analysis. On that front, to repeat, a court must “balance the employee’s interest in engaging in her speech with the employer’s countervailing interests.” Miller, 544 F.3d at 548. In the school context, those interests include a teacher’s ability to fulfill her duties in the classroom. See Melzer v. Bd. of Educ. Dist. of City of N.Y., 336 F.3d 185, 198-99 (2d Cir.2003). “[T]he amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech.” Miller, 544 F.3d at 549 n. 2; see also Dishnow, 77 F.3d at 197 (noting that the public employer must show that it “had a convincing reason to forbid the speech” in question). Though the School District argues that its “interest in curtailing speech that affected [CB East]’s operation [is] great,” School Dist. Br. 40, it has pointed to nothing suggesting that Mun-roe’s appearances in the national media (as distinct from her blog) interfered with her ability to educate her students. Nor has it argued that Munroe’s decision to tell her side of a story that spawned a spirited public debate negatively affected employee morale. My colleagues have no answer and say only that the First Amendment doesn’t require a school district to continue employing a teacher “who, when publicly confronted with her comments, not only refused to apologize — but even went so far as to defend her derogatory statements in the local and national media.” Maj. Op. 477.
The most that can be said of these arguments is that Munroe didn’t “take a conciliatory approach” when interviewed and “fanned the flames of controversy.” Mun-roe, 34 F.Supp.3d at 538. But, even if true, it says nothing about whether this made the job of running CB East more difficult. Furthermore, it is hard to take seriously the School District’s disruption argument when it did virtually nothing to quell the disorder that supposedly prevented CB East from satisfying its educational mission. After Munroe’s blog became public and the ensuing firestorm of publicity, the School District could presumably have asserted that its educational obligations outweighed Munroe’s free-speech rights and discharged her. But it opted instead to suspend her, which was of minimal import to Munroe, as this coincided with her planned maternity leave. The School District had a second opportunity to dismiss (or, at the very least, transfer) Munroe when, after her suspension was lifted,[1] CB East students opted out of her class en masse in August 2011. But again the School District didn’t do so. The result, in my view, is that the School District forfeited its right to match its operational *484 interests against Munroe’s free speech interests.
For these reasons, I see no path to conclude that the Pickering balance weighs in the School District’s favor.
That takes me to the final two questions, both of which deal with causation. First, were Munroe’s interviews a motivating factor in the School District’s discharge decision? See Watters, 55 F.3d at 892 (noting that, to succeed on a retaliation claim, a “plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action”). If they were, has the School District carried its burden to show that it would have reached the same decision regardless of the interviews? See id. Precedent counsels us to tread carefully when deciding issues of causation on summary judgment — all the more so here.
That School District officials were upset about Munroe’s media tour is made plain by two “smoking-gun” emails. After seeing Munroe appear on Fox News, a School District director, John Gamble, told his colleagues he was “confident [the Board] [was] doing the right thing.” To remove any doubt about what “doing the right thing” refers to, we need only look at the bottom of Gamble’s email, which makes clear it was sent in response to the “termination plan” Superintendent N. Robert Laws had circulated. At the end of that email, Laws too revealed how he felt about Munroe’s media tour, see id. (“I will not be drug [sic] into the mud of TV news entertainment....”), and that “Fox news ha[d] called [him] 6 times ... to appear on the Justice with Jeannie [sic] show,” id.
Against this background, I am persuad- • ed that Munroe has, at a minimum, created a jury question about whether her media interviews factored into the discharge decision. Nothing the School District has argued convinces me otherwise, i.e., that the causal connection “question is so free from doubt as to justify taking it from the jury.” Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir.2004) (quoting Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir.2002)). Despite its best attempt to shine a light on Munroe’s purported poor performance as the reason for her firing, the School District’s argument is unpersuasive if not disingenuous. A brief reiteration of Munroe’s employment history at CB East is in order.
After being hired to teach English in 2006, Munroe was awarded tenure only four years later in March 2010, on the recommendation of Principal Lucabaugh (who also wrote of Munroe in June 2008 that “[s]he is a consummate educator with a sparkling future”). During that time, her teaching record was pristine — she received the highest mark available (“satisfactory”) in eight consecutive performance evaluations. But then, on June 15, 2011— only a few months after her blog became known and she appeared on the media to defend her position in response to Luca-baugh’s televised announcement — Munroe received her first unsatisfactory evaluation. Among the concerns noted was Munroe’s sudden “inability to connect to ... students and make them feel that she cares about them” as well as the “overuse of vocabulary assignments and vocabulary assessments” and “inappropriate use of a ‘nanny cam’ during teaching hours.” Mun-roe’s troubles carried over to the next semester when school officials began dropping into her classes unannounced. The drop-ins, according to Munroe, became “calculated and unrelenting,” which led to her bosses “nitpicking everything [ ] [she] did.” Could anyone blame Munroe for believing they “had an agenda?”
Seven unannounced observations later, Munroe received her second unsatisfactory evaluation on January 20, 2012. Not unex *485 pectedly, she received a third and final unsatisfactory evaluation on June 1, which highlighted her continued performance issues and failure to submit lesson plans using the “Central Bucks School District designed template” — the latter a requirement to which she was never held until she began receiving unsatisfactory evaluations. Termination inevitably followed in June 2012.
In short, I have no doubt the School District was well aware that firing Munroe for her blog posts and media tour would land it in constitutional hot water. More than enough evidence suggests that firing her on performance grounds was a pretext for its real reason — she had spoken out to friends on a blog, it became public, School District officials were upset and proposed her termination, they decided to wait, the once-sterling evaluations of Munroe immediately became negative, and she was fired. The bottom line: too many signs suggest this was all a set-up that a jury needs to sort out. I thus respectfully dissent.

. Principal Lucabaugh announced that Mun-roe had a "legal right” to blog about her students and a "right to return” to CB East. He also indicated that a transfer “would be both irresponsible and further disruptive.”