In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1427

JEANNE HEDGEPETH,

*Plaintiff-Appellant,*

*v.*

JAMES A. BRITTON, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-03790 — **Manish S. Shah**, *Judge.*

ARGUED DECEMBER 12, 2024 — DECIDED AUGUST 26, 2025

Before RIPPLE, SCUDDER, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* Jeanne Hedgepeth, a high
school teacher with two suspensions and prior warnings of
possible termination, posted inflammatory messages to a Fa-
cebook account followed mostly by former students. The
posts prompted numerous complaints and media inquiries to
the school district. Given the disruption and previous warn-
ings, the school district fired Hedgepeth.

Hedgepeth sued the school district and other associated individuals under 42 U.S.C. § 1983, arguing that her discharge violated the First Amendment. The district court granted defendants summary judgment, and Hedgepeth appealed. We affirm. We hold that Hedgepeth failed to adduce sufficient evidence from which a reasonable juror could find in her favor on the merits of her First Amendment claim.

**I**

Until her dismissal in 2020, Hedgepeth taught social studies at Palatine High School (PHS) for twenty years. PHS is an Illinois public school located in Township High School District 211.

Prior to her termination, the District had suspended Hedgepeth twice. The first suspension came in 2016 after Hedgepeth erupted with profanity at her students after the 2016 United States Presidential Election, using the word "fucking" while in a "volatile emotional state." Citing policies demanding "just and courteous professional relationships" and student welfare, the District suspended Hedgepeth without pay for one day. Hedgepeth received an explicit written warning that future use of profanity or another similar incident would result in additional disciplinary measures, including possible termination.

Hedgepeth's second suspension occurred in 2019, after another profane outburst in the classroom, this time in response to a student. According to the incident report, she told the student, "You haven't even done your fucking homework," and directed him to "read the fucking chapter." She also replied "no shit" to another one of the student's comments. An audio recording of the incident documented Hedgepeth's heated

and profane comments. Apparently aware that her conduct violated District policy, she announced to the class that she would "surely be suspended for that." She was correct. Citing the same policies that led to her first suspension, the District suspended Hedgepeth without pay again – this time for four days. It also issued a notice to remedy, again warning of possible dismissal, and required her to attend at least six counseling sessions.

The following year, on May 31 and June 1, 2020, during nationwide protests following the police killing of George Floyd, Hedgepeth made a series of posts on Facebook. At the time, she was vacationing in Florida. The first post, evidently in response to media reports about the ongoing protests, included pictures from her vacation with the caption, "I don't want to go home tomorrow. Now that the civil war has begun I want to move." A Facebook friend commented on her post, "Follow your gut! Move!!!!!!!!" to which Hedgepeth replied, "I need a gun and training."

In another Facebook post, Hedgepeth reposted a viral meme evoking the high-pressure water hoses used against civil rights protestors in the early 1960s that read, "Wanna stop the Riots? Mobilize the septic tank trucks, put a pressure cannon on em … hose em down … the end." Hedgepeth commented on her own post, "You think this would work?"

Finally, Hedgepeth engaged in an online debate with a former PHS student about race in America. Over the course of that debate, Hedgepeth wrote in a Facebook comment, "I find the term 'white privilege' as racist as the 'N' word."

According to Hedgepeth, former students constituted about 80% of her roughly 800 Facebook friends in June 2020.

Before and after making the posts, Hedgepeth configured her Facebook account to "private" and she did not accept "friend requests" from current PHS students. Those measures, however, especially with the very high percentage of former student Facebook friends, were inadequate to keep the "private" posts from the public domain.

The day after Hedgepeth made the posts, PHS Principal Tony Medina began receiving complaints from current PHS students and alumni, another teacher, and a parent, which he relayed to District Superintendent Lisa Small. The District also received emails, calls, and media inquiries (both local and international) regarding Hedgepeth's posts. The District promptly issued a press release clarifying that Hedgepeth's posts "do not reflect the values or principles of District 211" and apologizing "for any harm or disrespect that this may have caused." By the end of the first week of June, Hedgepeth met with District Human Resources Director James Britton, who told her that the District would investigate her conduct.

A week later, Britton and Superintendent Small met with Hedgepeth and informed her they planned to recommend that the District School Board fire her. Small based the recommendation on Hedgepeth's prior disciplinary sanctions and warnings, her Facebook posts, the public reaction to them, and her "lack of any understanding or appreciation for why many people found her comments objectionable." In addition to violating her prior disciplinary warnings, Small found that Hedgepeth had violated four other District policies, including one governing teacher conduct on social media and the same "just and courteous professional relationships" policy she had been disciplined for violating twice before.

The District Board held two public meetings, both of which included public comment. The first meeting featured at least 58 public comments on Hedgepeth's Facebook posts, most critical and a handful in support. At the second meeting, speakers also spoke mostly critically of Hedgepeth.

After holding the public meetings, the District Board voted to fire Hedgepeth. The District Board served Hedgepeth with a notice of charges, bill of particulars, and advised her of her right to request a hearing before the Illinois State Board of Education. The bill of particulars explained that the District Board no longer considered Hedgepeth qualified as a teacher because she did not conduct herself "in a manner that demonstrates good judgment," especially because she failed "to serve as [a] role model" for the community. The District Board further explained that her conduct had "damaged" Hedgepeth's effectiveness as a teacher, her broader reputation, and the reputation of PHS and the broader District community.

The bill of particulars went on, explaining that the District had by then "received over 135 emails and phone calls expressing concern or outrage about your posts. The communications came from former students, parents, current students and staff. Your postings also received media coverage, including on WGNTV, ABC7, NBC5, Fox 32, the New York Post and the Daily Herald." The District Board viewed this as incompatible with Hedgepeth's workplace duties, which required Hedgepeth "to work with staff and students of all backgrounds and races" such that her posts "injure[d] and

impede[d] the efficiency of the District's provision of services."[1] Citing as well to Hedgepeth's prior disciplinary history, the District Board concluded that Hedgepeth had "lost the trust and respect of colleagues and students."

Hedgepeth's immediate response was to request a review hearing before the Illinois State Board of Education. At the hearing, Hedgepeth was represented by counsel and had the opportunity to call witnesses, offer documents into evidence, cross-examine witnesses, and present arguments. Among other things, Hedgepeth argued that her termination was wrongful because her Facebook posts were protected under the First Amendment. The hearing officer applied the balancing test under *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968) and found that Hedgepeth's dismissal did not violate her First Amendment rights.

While awaiting decision on her administrative hearing, Hedgepeth elected to seek relief in federal court as well. She sued the District and various District Board members who voted in favor of her termination (including Superintendent Small and Director Britton), alleging that they violated her First Amendment rights. After the close of discovery, the district court granted summary judgment to all defendants (together, the District), holding that Hedgepeth was collaterally estopped from bringing her First Amendment claim because she pursued appellate review before the Illinois State Board of Education and that, in any event, her claim failed on the merits.

---

[1] This was no hypothetical concern. PHS has a highly diverse student body composed of 5.3% Black, 46.1% Latino, 8.1% Asian, and 37.9% white students as of 2020.

**II**

We review the district court's order granting summary judgment to the District de novo, drawing all reasonable inferences in Hedgepeth's favor. *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 900 (7th Cir. 2024). We can affirm the district court's grant of summary judgment on any ground supported by the record. *See Hoffstead v. Ne. Reg'l Commuter R.R. Corp.*, 132 F.4th 503, 514 (7th Cir. 2025) (citation omitted). We agree that summary judgment for the District was appropriate on the merits, and we decline to rule on the preclusive effect of decisions by the Illinois State School Board.

**A.**

"Public employees do not relinquish their First Amendment rights as a condition of entering government service …." *Kilborn v. Amiridis*, 131 F.4th 550, 557 (7th Cir. 2025) (gathering cases). Instead, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted). But just like "private employers, the government needs to exercise control over its employees to provide public services effectively." *Kilborn*, 131 F.4th at 557 (citations omitted). In other words, public employees "by necessity … accept certain limitations on [their] freedom," which may be particular to that employee's role and whether it is a public-facing role of "trust." *Garcetti*, 547 U.S. at 418–19.

A public employee bringing a First Amendment retaliation claim must prove three things: (1) that she engaged in constitutionally protected speech, (2) that she suffered a deprivation likely to deter such speech, and (3) that the speech

was a motivating factor in her termination. *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019).

This case turns on the first element: whether Hedgepeth's Facebook posts are constitutionally protected speech. That issue is a question of law, though it may require courts to make certain "predicate factual determinations." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

Whether a public employee's speech is protected under the First Amendment follows a two-part framework. *See Harnishfeger*, 943 F.3d at 1113. First, we ask "whether the employee is speaking as a citizen on a matter of public concern." *Kilborn*, 131 F.4th at 557 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). If so, we proceed to the second step: balancing the employee's interest in commenting on matters of public concern against the government employer's interest "in promoting the efficiency of the public services." *Pickering*, 391 U.S. at 568.[2] Even speech addressing matters of public concern may lose constitutional protection if the government's interest in workplace efficiency outweighs the employee's interest in speaking freely. *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 795 (7th Cir. 2016).

There is no dispute that Hedgepeth spoke, through her May 31 and June 1 Facebook posts, as a citizen on a matter of public concern. Accordingly, we must apply *Pickering* balancing to weigh her First Amendment interests against the

---

[2] Hedgepeth asks us to depart from or otherwise modify Supreme Court precedent because *Pickering* balancing is inconsistent with the original public meaning of the First Amendment. That is beyond our authority to decide as an intermediate court of appeals. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

District's interest in workplace efficiency. *Harnishfeger*, 943 F.3d at 1115.

Under *Pickering*, the employer bears the burden of showing that its interest in workplace efficiency outweighs the employee's right to speak. *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1118 (7th Cir. 2013). In evaluating whether the employer has met this burden, courts consider seven factors:

> (1) [W]hether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek*, 832 F.3d at 796 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). That being said, we have also made it clear that these seven factors are "not a doctrinal touchstone and certainly not a straitjacket" insofar as "it's not necessary to consider each one." *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025).

In the public education context, the critical focus of each factor is "the effective functioning of the public employer's enterprise." *Craig*, 736 F.3d at 1119 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). We have held that

"[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function, so avoiding such interference can be a strong state interest." *Id*. School officials can also act to nip reasonable predictions of looming disruption in the bud. *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1014 (7th Cir. 1997). We stress that those predictions must be reasonable, meaning that they are "supported with an evidentiary foundation and [are] more than mere speculation." *Chaklos v. Stevens*, 560 F.3d 705, 715 (7th Cir. 2009) (quoting *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 944 (7th Cir. 2004)).

The level of disruption needed to justify a restriction varies with context. *Craig*, 736 F.3d at 1119. The more serious and politically charged the message, the stronger the government's justification must be. *Id.* (citing *McGreal v. Ostov*, 368 F.3d 657, 681–82 (7th Cir. 2004)). By contrast, when the speech is "less serious, portentous, and political," a lighter justification by the employer may suffice. *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) (citation modified). Also, employers enjoy "more leeway in restricting the speech" of a public-facing employee like a classroom teacher who must maintain public trust and respect to be effective. *Craig*, 736 F.3d at 1119. Finally, the time, place, and manner of the speech factor into the overall analysis. *Id.* (citation omitted).

**B.**

After weighing the undisputed facts in the light most favorable to Hedgepeth, we conclude that the District's interest

in addressing actual disruptions and averting future disruption outweighed Hedgepeth's speech interests.

Start with the District's evidence. The District produced a wealth of undisputed evidence of the actual disruption at PHS engendered by Hedgepeth's posts.[3] By the time the District Board voted to dismiss Hedgepeth in July, the District had received 113 emails about her posts. The record contains many examples of students and parents expressing concern about Hedgepeth's fitness as a teacher. In an email to District Board member Kimberly Cavill, students shared that,

> [a]s students of color, we feel angered by Ms. Hedgepeth's statements and feel that she should no longer have a place as staff at PHS. … We don't want a teacher at Palatine who believes we are being dramatic when a racist act has been done against us. We want a teacher who understands what we are going through and … the obstacles presented to us for simply being of different color.

This evidence of internal disruption is enough to distinguish *Melton v. City of Forrest City*, --- F.4th ---, 2025 WL 2329190 (8th Cir. Aug. 13, 2025). There the Eighth Circuit reversed summary judgment for a fire department because "[n]o current *firefighter* complained" about the plaintiff's

---

[3] To dispute the disruption evidence, Hedgepeth produced a declaration from Julie Schmidt Aymler which analyzed the 113 emails and found that some were duplicative. Even crediting that declaration, the District still faced a tremendous amount of scrutiny, both from the local community and press, which is unrebutted.

social media posts. *Id*. at *7 (emphasis in original). Here, the opposite is the case.

The disruption was not limited to PHS's students—it rippled through the entire community. Hedgepeth's posts threw school and district operations into disarray and unsettled her colleagues' classrooms. The posts sparked outrage, drew media attention, and forced the District into a costly and time-consuming public relations response. Just days after her posts, other PHS teachers told the principal that summer school had been derailed by ongoing discussions about the controversy. The undisputed record further confirms that Hedgepeth's posts interfered with core District functions by diverting staff and resources to address widespread concerns from the community and the press. Given the scale of the fallout on top of Hedgepeth's prior disciplinary history, the District reasonably concluded that her conduct undermined her job performance. This is precisely the "interference with work, personnel relationships, or the speaker's job performance" that we have routinely recognized as constituting a "strong state interest." *Craig*, 736 F.3d at 1119.

Critically, these disruptions did not occur in a vacuum. The District was entitled to look at Hedgepeth's entire employment record. That context reveals two prior, serious incidents of workplace discipline for similar violations of the District's decorum policies. The District was not required to wait around for a fourth violation. *Kristofek*, 832 F.3d at 796 ("[A] government employer is allowed to consider both the actual *and* the potential disruptiveness." (citing *Lalowski v. City of Des Plaines*, 789 F.3d 784, 791–92 (7th Cir. 2015))).

None of Hedgepeth's arguments compel a different result. She first argues that her speech concerned "debate about …

George Floyd's death" and therefore was "vital to informed decisionmaking." *See Rankin*, 483 U.S. at 387. This argument misunderstands the relationship between step one and step two of the test. We agree with Hedgepeth that, in commenting about ongoing national protests, she spoke on important matters of public concern, which is why she is entitled to proceed to *Pickering* balancing at step two. But the inquiry at step two is different. The question is not whether Hedgepeth's speech implicates the First Amendment (it does), it is whether the District's interest in workplace efficiency outweighs her right to speak. *See Craig*, 736 F.3d at 1118.

True, in some cases, the step two analysis must presumptively elevate a teacher's expressive interest over the employer's interest in avoiding disruption. In *Pickering* itself, for example, "the Court observed that '[t]eachers are … the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent'" and therefore it is "essential" that teachers "be able to speak out freely on such questions without fear of retaliatory dismissal." *Lane v. Franks*, 573 U.S. 228, 239–40 (2014) (quoting *Pickering*, 391 U.S. at 572).

This is not such a case. "Special knowledge" contemplates situations where, for example, an employee learns of misconduct and brings the issue to light or an employee testifies to the existence of corruption in the allocation of public funds. *See Garcetti*, 547 U.S. at 425 (holding that speech which "expose[s] governmental inefficiency and misconduct is a matter of considerable significance" for purposes of *Pickering* balancing). There is no dispute that Hedgepeth's speech was not informed by any specialized expertise or knowledge gained through her status as a public employee. Hedgepeth

described these posts as either jokes or as sharing the views of others, not her own. Further, Hedgepeth's "use of vulgar language" – i.e., jokes about excrement – weakens her speech interests since her role of public trust counsels instead for a "calm, reasoned presentation of her views on [a] sensitive subject" in order to be effective in the classroom and respected in the PHS community. *Darlingh*, 142 F.4th at 566–67. Given that context, while her speech was certainly not devoid of constitutional value, the District's showing of substantial disruption engendered by Hedgepeth's conduct is sufficient to outweigh her interest in expression.

Hedgepeth also emphasizes that she made her posts on a private personal Facebook account that did not specifically identify her as a PHS employee. She is right that speech made outside of the workplace may be less disruptive to the "efficient functioning of the office." *See Rankin*, 483 U.S. at 388–89. That said, speech on social media is no automatic win for Hedgepeth, far from it. Her decision to post inflammatory comments to an audience that she herself curated—80% of whom were part of the PHS community—carried a clear risk of amplification. *See Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) ("A social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency."). Even with minimal privacy settings, Hedgepeth's audience choice rendered any claim to private speech illusory. Her posts, though not technically public, functioned more like a stage whisper than a secret. Thus, even drawing inferences in her favor, the posts predictably and rapidly circulated within

the PHS community, including among current students and faculty, and shaped public perception of her as a teacher.

Hedgepeth next argues that her termination on the grounds of workplace disruption amounts to affording the PHS community a "heckler's veto" over the content of her speech. But, on the factual record before us, our precedent squarely forecloses that argument. Most significantly, "this argument does not account for the unique relationship" that Hedgepeth has to her audience as a public school teacher and therefore a role model for others in the PHS community. *Craig*, 736 F.3d at 1121. We have repeatedly recognized that public school teachers occupy a unique position of trust. *See id.* (citing *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 199 (2d Cir. 2003) (drawing analogy to *in loco parentis*)); *see also Darlingh*, 142 F.4th at 567 ("Teachers occupy roles that entail an inordinate amount of trust and authority, which makes the government's interest particularly compelling." (citation modified)). PHS community members, including current students who predictably saw her posts, "are not 'outsiders seeking to heckle [Hedgepeth] into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function.'" *Craig*, 736 F.3d at 1121 (citation omitted).

Nor is it persuasive that some community members expressed support for Hedgepeth, which we construe as a variation on the heckler's veto theme. As the Second Circuit has recognized, just because "some parents and students expressed support for [Hedgepeth] as a person harmlessly expressing [her] ideas," it can still be "entirely reasonable for the Board to believe that many parents and students had a strong negative reaction to [her], and that such a reaction caused the

school to suffer severe internal disruption." *Melzer*, 336 F.3d at 198.

Hedgepeth also devotes a substantial amount of her briefing to arguments that her posts were not racist or racially inflammatory. Such considerations are irrelevant to our decision. Instead, we emphasize that the District has produced unrefuted, objective evidence of significant disruption of workplace operations.

Zooming out, the District produced ample undisputed evidence of actual disruption. That evidence shows that Hedgepeth did not lose her job because she expressed her views on a matter of public concern on Facebook. Rather, she lost her job because she posted a series of vulgar, intemperate, and racially insensitive messages to a large audience of recent PHS alumni. The District's undisputed evidence demonstrated that these posts predictably rippled throughout the community causing substantial disruption among current students and faculty and at school board meetings, even attracting local and international media attention. Emphasizing that this was Hedgepeth's third strike and not an isolated incident, the District reasonably concluded that the scope and intensity of the disruption created an insurmountable barrier to the high school's learning environment in the fast-approaching academic year. Hedgepeth has failed to rejoin this capacious showing to sufficiently carry her burden at summary judgment. We therefore conclude that Hedgepeth's posts were not entitled to First Amendment protection.

Accordingly, we AFFIRM the judgment of the district court.